ERMINNIE C. MATHEWS, Appellant, *vs.* THE CITY OF CHICAGO *et al.* Appellees.—Same Appellant *vs.* THE COUNTY OF COOK *et al.* Appellees.—Same Appellant *vs.* THE BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.* Appellees.

*Opinion filed December 18, 1930.*

122

BUTLER, LAMB, FOSTER & POPE, (RUSH C. BUTLER, and ALLAN J. CARTER, of counsel,) for appellant.

SAMUEL A. ETTELSON, Corporation Counsel, JOHN A. SWANSON, State's Attorney, JOHN G. DRENNAN, EDWARD C. HIGGINS, GOTTHARD A. DAHLBERG, JAMES TODD, LOUIS H. GEIMAN, HAYDEN N. BELL, WILLIAM F. STRUCKMANN, DODD & MATHENY, and TOLMAN, SEXTON & CHANDLER, (SILAS H. STRAWN, EDGAR B. TOLMAN, and WALTER F. DODD, of counsel,) for appellees.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

Erminnie C. Mathews, a tax-payer of the city of Chicago and county of Cook, in her own behalf and in behalf of such other tax-payers of the city, county and State as might be similarly situated and chose to join in the suits, filed three bills in the circuit court of Cook county attacking the constitutionality of three acts passed by the Fifty-sixth General Assembly at its special session held in May and June, 1930, and praying for an injunction restraining the defendants in the respective cases from issuing and selling any bonds for the creation or maintenance of a "working cash fund" under the supposed authority of the act involved in the particular case. In each case the bill was demurred to, the demurrer was sustained, the bill was dismissed for want of equity, and the complainant appealed.

The defendants in No. 20391 were the city of Chicago, its mayor, comptroller and city clerk; in No. 20392, the county of Cook, the president of its board of commissioners and the county clerk; in No. 20393, the board of education of the city of Chicago, its president and secretary, the city of Chicago and its mayor and comptroller. The questions involved in the three cases are substantially the same and the appeals have therefore been consolidated and were argued together.

The three acts in question purport to authorize the creation, maintenance and administration of a "working cash fund" in cities having a population of 150,000 or more, in counties having a population of 500,000 or more, and in each school district constituted of a city exceeding 100,000 in population and under the charge of a board of education, being a body politic and corporate by the name of "Board of Education of the city of .........." The working cash funds in cities and in counties are provided for by separate acts, the one applying to cities having the required population, (Laws of 1930, Special Sess. p. 24,) and the other to counties having the required population. (Ibid. p. 49.) The fund for boards of education is provided for by the addition of sections 134½ and 189¼ to the General School law. (Ibid. pp. 98, 110.) These enactments purport to authorize the issue, without a referendum, for the purpose of creating such working cash funds, of bonds to the amount of $12,000,000 by the city of Chicago, $6,500,000 by the county of Cook, and $25,000,000, but not more than one-half in any calendar year, by the board of education of the city of Chicago, with the consent of the city council. It is alleged in each bill that the respective corporations have taken action for the issue and sale of bonds to the amount authorized.

It is unnecessary to describe in detail the condition of extreme financial need of the city of Chicago, the county of Cook and the board of education of the city of Chicago which preceded the calling of the special session of the General Assembly in May, 1930, or the causes of such condition. All of these municipal corporations were largely indebted, their credit was greatly impaired, and the loss of revenue by the delayed collection of taxes, combined with other causes, made uncertain their ability to meet the current expenses of municipal operation. To meet this emergency for the present as well as to stabilize the finances of the municipalities for the future was the object of the special session. To raise the cash to pay the current liabilities of

the municipalities, sales of bonds were necessary, and to stabilize the finances of the municipalities the legislature adopted the plan of creating a revolving fund of the proceeds of the bonds authorized to be issued, which was denominated a "working cash fund," the money in which should not be regarded as current assets available for appropriation and should not be appropriated in the annual appropriation bill by the city council or the county board or in the annual school budget by the board of education. However, it is provided that money in the working cash fund may be transferred in whole or in part, in order to provide money for the payment of salaries and other corporate purposes, to the general corporate fund of the city or county to be disbursed therefrom for general corporate purposes, in anticipation of the collection of that part of the taxes levied for general corporate purposes which is in excess of the amount required to pay any warrants issued under the provisions of sections 2 and 3 of the act "to provide for the manner of issuing warrants upon the treasurer of the State or of any county, township, city, village or other municipal corporation and jurors' certificates," approved June 27, 1913, (Laws of 1913, p. 608,) as amended, (Laws of 1930, Special Sess. p. 113,) and any notes issued under the provisions of an act concerning the anticipation of taxes, and obligations in respect thereof, in counties having more than 500,000 population, approved and in force May 22, 1929. (Laws of 1929, p. 298.) Upon the receipt by the treasurer of any taxes or other money in anticipation of the collection or receipt whereof moneys of such working cash fund have been so transferred for disbursement, such fund shall immediately be reimbursed therefrom until the full amount so transferred has been re-transferred to such fund, and unless the taxes so received and applied to the reimbursement of the working cash fund prior to the first day of the seventh month in counties, or the eighth month in cities or school districts,

following the month in which due and unpaid real property taxes by law begin to bear interest, shall be sufficient to effect a complete reimbursement of such fund for any moneys transferred therefrom in anticipation of the collection or receipt of such taxes or other moneys, such working cash fund shall be reimbursed for the amount of the deficiency therein from any other revenues accruing to said general corporate fund, and it shall be the duty of the city council or the county board to make provision for the immediate reimbursement of the amount of any such deficiency in its next resolution termed the "annual appropriation bill." In the case of the board of education the transfers from the working cash fund can be made only for salaries and other educational purposes to the educational purposes fund of the board of education and so disbursed therefrom in anticipation of the collection of any taxes lawfully levied for educational purposes, and the deficiency in reimbursement must be provided for by the board of education in its next annual school budget. Thus the working cash fund constitutes a revolving fund from which money may be transferred to other funds in anticipation of taxes to be collected for the purposes of such other funds, to be re-paid later out of the taxes levied for such other funds when collected, and a method is provided enabling the municipality to do business on a cash basis by transferring money from the working cash fund to other funds during the time between the levy of taxes for such other funds and the collection of the taxes so levied.

From the money arising from the sale of the bonds authorized by these acts, transfers will be made by the municipalities to the various corporate funds which are in need of money and will then be disbursed only for the purposes specified in the annual appropriation bills or school budget. When the taxes levied for those purposes are collected several months later the money will be returned to the working cash fund, to be again transferred to the various cor-

porate funds after the next year's levies for those funds have been made, and then to be again returned to the working cash fund from the collection of the taxes levied, and so on year by year, the working cash fund having money to its credit after the collection of taxes for each year, of which it will be depleted after the levies are made for the succeeding year and before the collection of the taxes so levied. It is further provided that transfers from the working cash fund to the general corporate fund of the municipality shall be made only by the city council by ordinance or the county board or board of education by resolution, setting forth the taxes in anticipation of whose collection the transfer is to be made and from which the working cash fund is to be reimbursed, the entire amount of taxes extended or estimated to be extended in anticipation of the extension of which such transfer is to be made, the amount of anticipation warrants issued against such taxes and interest accrued or estimated to accrue, and the amount theretofore transferred from the working cash fund to the general corporate fund. The amount directed to be transferred in anticipation of the collection of taxes levied in any year, together with the aggregate amount of anticipation warrants theretofore drawn against such taxes and interest accrued or estimated to accrue, and the aggregate of such transfers theretofore made shall not exceed ninety percentum of the actual or estimated amount of such taxes extended or to be extended, as set forth in the ordinance. The act also provides that for the purpose of providing money for such working cash fund, the city, county and board of education shall each have power to levy annually a tax not to exceed in the case of the city or the board of education one-tenth of one per cent and in the case of the county not to exceed two cents on the $100, beginning in the case of the city in 1930, in the case of the county in 1933 and in the school district in 1935. The collection of any such tax is not to be anticipated by the issuance of any warrants drawn against

it, is to be in addition to the maximum of all other taxes authorized by law to be levied by the municipality, and is not to be regarded as a part of the tax levy of the municipality to be included in the aggregate of taxes to be reduced.

It is contended by the appellant that the acts of the legislature purporting to authorize these three "working cash fund" bond isssues are unconstitutional because they are local and special laws, in violation of the prohibitions of section 22 of article 4 of the constitution, and because they attempt to authorize taxation which is not needful and is for other than a public or corporate purpose, in violation of sections 1 and 9 of article 9 and section 2 of article 2 of the constitution. It is also contended that the acts are so vague, uncertain and arbitrary in failing to provide any definite limitation of the amounts that may be accumulated in the working cash funds as to be inoperative and void; and that the amendment to section 134½ of the School act is void because it is impossible to determine whether the bonds therein provided for are obligations of the city of Chicago or of the board of education of the city of Chicago.

The acts in question apply to cities having a population of 150,000 or more, to counties having a population of 500,000 or more and to school districts having a population exceeding 100,000, and Chicago is the only city, Cook the only county and the city of Chicago the only school district included within those terms. It is the contention of the appellant that the classification by population is arbitrary and unreasonable and that the acts are therefore local and special, in violation of the specific prohibition of local and special laws incorporating cities, towns or villages, or changing or amending the charter of any town, city or village, in the case of the City act; regulating county and township affairs, in the case of the County act; and providing for the management of common schools, in the case of the amendment of the School law; and granting to any corporation, association or individual any special or ex-

clusive privilege, immunity or franchise in reference to all the acts.

The prohibition contained in section 22 of article 4 of the constitution against the passage of local or special laws in certain enumerated cases does not mean that every law shall affect alike every place and every person in the State but it does mean that it shall operate alike in all places and on all persons in the same condition. When referring to legislation the term "local" means laws relating to a portion, only, of the territory of the State, and the term "special," laws which impose a particular burden or confer a special right, privilege or immunity upon a portion of the people of the State. (*People* v. *Wilcox,* 237 Ill. 421; *People* v. *Day,* 277 id. 543; *People* v. *Diekmann,* 285 id. 97.) Whether laws are general, local or special does not depend upon the number of those within the scope of their operation. They are general not because they operate in every place or upon every person in the State, but because every place or person brought within the relations or circumstances provided for is affected by the law. (*People* v. *Diekmann, supra.*) A law general in its nature and uniform in its operation upon all persons coming within its scope is a general law. The legislature may impose limitations upon the action of individuals or classes of individuals but it may do so only by general laws, and if it imposes restrictions on some and not upon others the difference must be based upon a substantial difference of conditions having a reasonable relation to the object of the legislation which differentiates the one class from the other. (*People* v. *Kewanee Light Co.* 262 Ill. 255.) All reasonable doubts are to be resolved in favor of upholding the validity of the statute. (*People* v. *Gordon,* 274 Ill. 462.) An act is not local merely because it operates in but one place. We have repeatedly held that a law may be general and yet operative in a single place where the condition necessary to its operation exists. (*People* v. *Kaelber,* 253 Ill. 552; *West*

*Chicago Park Comrs.* v. *McMullen,* 134 id. 170; *Martens* v. *Brady,* 264 id. 178.) Whether the condition exists in one place or many, if the classification is reasonable and just it does not violate the constitution and it applies to all places now within its terms and to all that may hereafter come within its terms.

Classification with reference to population is of frequent occurrence in legislation. The constitution authorizes it in section 12 of article 10 as a basis for fixing and regulating the fees of public officers, and also established such a classification in section 10 of article 10 with reference to the amount of the compensation which the county board might fix for county officers. Section 20 of article 6 of the constitution authorized the establishment of a probate court in each county having a population of over 50,000, and in 1877 the legislature passed a law establishing probate courts in all counties having a population of 100,000 or more. The only county in the State having this population then was Cook, though four other counties had more than 50,000 population. By the census of 1880 LaSalle county was found to have a population slightly in excess of 70,000, and when the legislature met in 1881 it amended the law establishing probate courts by reducing the required population to 70,000. LaSalle was the only county, in addition to Cook, which met this requirement though four other counties had been added to the 50,000 class. An information in the nature of *quo warranto* was filed against Judge Knickerbocker, of the probate court of Cook county, to oust him from his office on the ground of the unconstitutionality of the act establishing probate courts. This was the only question in the case, and the circuit court of Cook county entered a judgment of ouster, from which the respondent appealed. The judgment was reversed, the court saying: "Appellees insist that under this section the legislature has no power to authorize the establishment of such a court in any county, notwithstanding the number of its inhabitants

may be ten times 50,000 and the necessities of business may absolutely demand it, except upon the condition it at the same time and by the same act provides for like courts in all other counties in the State having a population in excess of 50,000, however small that excess may be, although the people of such other counties may neither need nor desire the establishment of such courts in them. Whatever the framers of the constitution may have intended by this section, it is clear they have not in express terms said what appellees impute to them. * * * By this limitation upon the power of the legislature to establish such courts the authors of that instrument determined in advance there never would be any necessity for this class of courts in counties not having a population in excess of 50,000. As to all other counties the whole subject was left under the control of the legislature to the same extent as if no limitation had been imposed. The legislature was left entirely free to establish such courts or not. Doubtless the convention, in leaving this matter within the discretion of the legislature, expected and intended that it would be exercised wisely and in furtherance of the best interests of the people of the respective counties in which such courts might or might not be created. It is altogether unreasonable to suppose that it was intended that these courts should be established in counties having no need for them although they might have a population of something over 50,000, or that it was intended that counties having a need for such courts by reason of having several hundred thousand inhabitants, should be deprived of them merely because there might be other counties not excluded by the limitation that have no need or desire for such courts." (*Knickerbocker v. People*, 102 Ill. 218.) The classification into counties of a population of over 50,000 and those of 50,000 or less is made by the constitution itself, and, of course, no question of its constitutionality could arise, but the decision recognizes the constitutionality of a legislative classification

based on a population of 70,000, independent of the constitutional classification.

In *People* v. *Edmands*, 252 Ill. 108, the Commission Form of Municipal Government act (Laws of 1909, p. 12,) was held not to be a special or local law affecting the incorporation of cities, towns or villages, because it was only to become effective in municipalities adopting it by vote, or because the people by vote might cease to act under it, or because it could only be adopted by cities having a population not exceeding 200,000.

In *Booth* v. *Opel*, 244 Ill. 317, the constitutionality of an act concerning the levy and extension of taxes was drawn in question. The act provided for the reduction by the county clerk in each county of the rate per cent of the tax levy in each taxing district in which the rates certified to him should exceed three per cent of the assessed value of the property upon which the taxes were to be assessed, in the same proportion in which it would be necessary to reduce the highest aggregate per cent of all the tax levies to bring them down to three per cent of the assessed value of the taxable property upon which the taxes were required to be extended. A proviso to the act created limitations as to different taxing districts based on population, providing a different rate of reduction for counties having a population over 300,000 and for cities having a population over 150,000 from the rate for counties and cities of less population. One objection made to the law was that it was a local and special law regulating county and township affairs. The court said that if the act did amount to a regulation of county and township affairs the different limitations were based solely on population, and classification by population might be valid if the number of inhabitants created substantial differences concerning the subject of the legislation. After citing several decisions the court said: "From these and other decisions it becomes manifest that a law is not local or special for the reason that it classifies counties or

townships on the basis of population if the number of inhabitants creates substantial differences in situation and needs concerning the subject of the legislation, and the court will determine that question whenever it arises in a judicial proceeding, for the purpose of deciding whether an act conflicts with the constitutional provision. We think it is equally manifest that there is a reasonable ground of distinction with reference to the rate of taxation for county and other purposes specified in the second proviso to this act, between densely populated counties and cities and those which are sparsely settled. It is not an unreasonable conclusion that a slightly lower rate of taxation would be required for the discharge of all the duties imposed upon county boards in counties of a population of 300,000 or more than those of less population, and the same may be said with reference to school taxes and taxes for city or village purposes. We conclude that if the act is viewed as one regulating county or township affairs it is not rendered local or special by the different limitations in the second proviso." In that decision the case of *Devine* v. *Commissioners of Cook County*, 84 Ill. 590, was distinguished on the ground that the act there considered, which was limited in its operation to six years and to a county where there had been a recent destruction by fire of public buildings and was for the purpose of erecting a court house on a site previously used, could apply only to Cook county and was passed with plain intent to evade the constitutional provision.

Numerous cases have been decided where classification by population has been held valid on account of dissimilarity of conditions in the different municipalities because of the difference in population. Among them are *Cummings* v. *City of Chicago*, 144 Ill. 563, *Weksler* v. *Collins*, 317 id. 132, *People* v. *Kesner*, 321 id. 230, *Michaels* v. *Hill*, 328 id. 11, *People* v. *Onahan*, 170 id. 449, and *L'Hote* v. *Village of Milford*, 212 id. 418.

*L'Hote* v. *Village of Milford, supra,* is a good example of an arbitrary classification of cities by population for the purpose of regulating consents of property owners to local improvements to be paid for by special assessment. It places together in one class very large cities and very small villages, and in another class cities of intermediate size, and divides the latter cities into sub-classes having different rights. When considered in view of the population of certain cities as disclosed by the census, the court deemed it as manifest that the legislation was adopted for the purpose of securing local and special legislation for the benefit of certain particular cities which could not be named in the act but which could be designated with no less certainty by means of the classification, and that there was no actual or rational distinction which would justify the classification.

It is argued that there is no difference, except in degree, between the situation existing in the city of Chicago, the county of Cook or the board of education of the city of Chicago and the conditions which exist in Peoria or Will county or any of the larger cities and other school districts in the State; that similar periods of time elapse between the time when taxes are levied and the time of their collection, and if a real need exists to supply funds for corporate expenses during the interim between the levy of taxes and their collection in Chicago and Cook county the same need exists in every other county and municipality in the State, and the privilege of raising a fund by taxation to be kept on hand for that purpose is not founded upon a rational basis and therefore violates the constitution. Even if the difference be one of degree, only, it may be sufficiently great to require a difference in methods of municipal action. The constitution does not require every city, village, school district or other municipality to have the same organization, officers or powers, and a classification based upon substantial differences in population and a resulting necessity for

different powers has been recognized as valid in the cases which have been cited. (*Michaels* v. *Hill, supra.*) "If the conditions existing in any county at the time of the passage of an act furnish a reasonable basis for making it apply only to that county, and the classification is reasonably appropriate for the purpose of the legislation, it is not essential to the validity of such classification that the conditions upon which it is based are such that they may obtain in every county in the State. It may be similar conditions may never exist in any other county and the law be valid." *Martens* v. *Brady, supra.*

There are many school districts in the State having from a single school house to half a dozen or a dozen, and from one teacher to a dozen or score or fifty or more, and a comparatively small number of pupils, running from a few to a few hundred, with a revenue from a few hundred dollars or a few thousand to one or two hundred thousand dollars or more. There are cities and villages having a small population of a few hundred or a few thousand, with a police force of one or half a dozen or a dozen men, a fire department with a half dozen volunteer firemen or perhaps some paid firemen—a simple organization with small revenue. More than one-third of the counties of the State have less than 20,000 population and less than 500 square miles of territory. The three municipalities which are now affected by the acts under consideration have populations exceeding 3,000,000 people on a little over 900 square miles of territory—more than 3200 to the square mile—with a density of population fifty times as great as the average density in the rest of the State. These municipalities have more than 35,000 employees. The annual revenue of each of them is measured by hundreds of millions of dollars instead of thousands. These facts, alone, make it clear that the methods required for the collection, care and disbursement of the comparatively small amounts required by the much smaller municipalities throughout the State would be

entirely inefficient for the much larger amounts involved in these larger municipalities, and that the complex financial and business organization for the larger municipalities would be either impracticable or unnecessarily burdensome and expensive for the smaller, and demonstrate that the classification made by the three acts is natural and rational. It is true that there are no other counties, cities or school districts in the class with those which are made defendants in these three suits. There are none very close to the class and there may never be any in the same class, but this does not render the classification void. The conditions there existing furnish a reasonable basis for making the acts in question have effect only in the municipalities to which they respectively apply, and the acts are therefore valid though similar conditions may never exist in another municipality.

The appellant's objections in No. 20393, that the amendment to the School law confers a special privilege on the board of education of the city of Chicago, and that it violates the obligation of section 1 of article 8 of the constitution because it does not apply to all the schools of the State, are answered by what has been said in regard to legislative classification. The same reasons which make the classification proper in regard to the city and county apply also to the school district.

Section 1 of article 9 of the constitution requires the legislature to provide such revenue as may be needful by levying a tax, section 9 of the same article provides that all municipal corporations may be vested with authority to levy and collect tax for corporate purposes, and section 2 of article 2 declares that no person shall be deprived of life, liberty or property without due process of law. This last cited provision is violated if a person is taxed for what is not needful, as required by section 1 of article 9, or is not for a corporate purpose, as required by section 9 of article 9. It is contended that the acts in question are unconstitutional and violate all these provisions because they attempt to raise

money for a purpose which is not needful and is not for a public or corporate purpose. There can be no doubt that a tax can be raised only for a public purpose and for public needs of the district within which it is levied. (*Board of Education* v. *Haworth,* 274 Ill. 538.) Counsel state that the working cash fund plan, so far as they are aware, is novel, and they have been unable to discover that any such scheme has been adopted in any State. Its novelty is no objection to its validity if it serves a public corporate purpose. Under our law for the levy and collection of taxes the levies are made at various dates, usually in the months from March to September, including both. The taxes are not extended until December or until January or February of the next year, and the collection cannot proceed until the extension is completed. Liabilities accrue against the municipalities after the levies are made which must be met from the levies whose collection will not begin for several months. Great sums are required every month and from day to day to pay the municipal employees, to meet the current expenses and maintain the credit of the city, the county and the school district. The greater part of the tax levied is not paid until a year or more after the levy, and for this reason a deficit arises in the treasury of every municipal corporation, which must be provided for if its credit is to be maintained and its warrants to be paid and not hawked about to be sold at a discount. Accordingly the legislature, to meet this situation, passed a law in 1879 prohibiting the drawing of any warrants, payable on demand on the treasurer of the State or of any municipal corporation, when there is not sufficient money in the appropriate fund in the treasury to pay them, and providing for the issue of tax warrants whenever there was no money in the treasury to meet the ordinary and necessary expenses of any municipal corporation in anticipation of the collection of any taxes already levied for the payment of such expenses to the extent of seventy-five percentum of the total amount

of any such tax levy, such warrants showing on their face that they are payable solely from said taxes when collected and not otherwise. (Laws of 1879, p. 78.) This was the method authorized by the legislature at that time to provide a fund to meet all ordinary and necessary expenses which there was not sufficient money in the treasury to meet, and it has since continued in force with minor amendments providing for the payment of interest or the like, but without any change affecting the principle of providing a fund, by way of anticipation, to carry the municipality over the period during which otherwise liabilities would be accumulating with no money in the treasury to meet them. The raising of a fund by the sale of bonds to meet the deficit and the establishment from the proceeds of such sale of a revolving fund, to be increased from time to time, if necessary, by a levy of taxes, may be a novel scheme, but it is not different in principle from the raising each successive year of a fund for the same purpose by borrowing money by means of anticipation warrants. The latter method, which has been in use for fifty years, involves the payment of interest on the money borrowed by means of warrants and the other the raising of money by taxation, a part of which may be idle, perhaps, at times, after the completion of the collection of taxes for the year. The first objection urged to the scheme is that these funds, whether raised by bond issues or taxation, will be gathered for no specific purpose. The purpose for which the money to be raised is to be used is not uncertain. It is to meet the ordinary and necessary disbursements for salaries and other corporate purposes of the city or county and to meet the ordinary and necessary disbursements for salaries and other educational purposes of the school district, in anticipation of the collection of any taxes lawfully levied for general corporate purposes, and no part of it can be used for any other purpose than one for which appropriations have been legally made by the municipality. There is no constitutional re-

quirement that taxes levied by school districts, cities or counties shall state the specific purposes for which the levy is made. Such requirements are found only in the statute, and as they are established by statute they may be modified by the legislature.

It is objected that the fundamental difference between the working cash fund plan of providing funds during the period when the collection of taxes is insufficient to meet the current expenses of the municipalities and the use of anticipation warrants is, that the money obtained from the warrants is used for specific corporate purposes and the tax money when it comes in is applied to those specific corporate purposes by taking up the warrants, but under the working cash fund plan the money is never expended or used in the sense that it is permanently applied to any particular corporate use. The objection that the working cash funds are banking funds is not a valid objection to the acts. It is true that taxes should not be levied for the purpose of accumulating funds for the remote future or for contingencies which may never occur. Taxes are levied because they are necessary to defray the expenses of the government and not for the purpose of enriching the public treasury. The unnecessary accumulation of money in the public treasury is unjust to the people because it deprives them of the use of the money taken from them for a considerable period, and is impolitic, as it may tempt those having the custody of the funds to use them improperly. (1 Cooley on Taxation,—3d ed.—13.) It was held in the case of *People* v. *Atchison, Topeka and Santa Fc Railway Co.* 261 Ill. 33, that "the revenue statutes must be given a reasonable construction. It was not intended by the legislature that the county authorities should not have a reasonable discretion in arranging in advance for the collection of the necessary tax for the payment of the current expenses. We do not consider that the facts here show that a new levy of the amount needed for the ensuing year would be unreasonable.

It is the duty of the county board to use sound business judgment so that the county's credit will not be impaired. [Citing authorities.] The sale of anticipation warrants every year would tend to injure the credit of the county and cost the tax-payers more, in the end, than would result from collecting taxes for a portion of the county expense a few months in advance. In discussing the maxim that a revenue law ought to be so contrived as both to take out and to keep out of the pockets of the people as little as possible over and above what it brings into the public treasury, Judge Cooley lays down the rule that 'the maxim would justify any State in having its treasury in condition at all times to meet all possible claims upon it, but it condemns exactions from the people in advance of any needs of the government.' (1 Cooley on Taxation,— 3d ed.—13.) It is against the policy of the law to raise taxes faster than they are likely to be needed, but our statutes have committed to the just and reasonable discretion of the county boards the question as to what is the proper amount of taxes to be raised for the current county expenses. The courts will only interfere to prevent a clear abuse of such discretionary powers."

In *People* v. *Chicago and Eastern Illinois Railway Co.* 306 Ill. 402, it was held that "the presumption is that the county board has properly discharged its duty, and the mere circumstance that in estimating in advance the amount that may be necessary to be levied an amount greater than that actually required has been determined upon, is no defense to a tax-payer in refusing to pay his taxes unless the amount levied is so grossly excessive as to show a fraudulent purpose in making the levy. * * * The county board has the right to provide for maintaining a balance in the treasury sufficient at all times to meet all current claims upon it."

The same principle that it is not necessary for taxing authorities to wait until the money is actually needed for

paying outstanding obligations before taxes may be levied, but they have the right to, and should, anticipate, as nearly as they can, the amount of moneys that should be raised to meet obligations when they become due, is announced in *People* v. *Chicago and Northwestern Railway Co.* 331 Ill. 544, *People* v. *Crear*, 300 id. 611, *People* v. *Toledo, St. Louis and Western Railroad Co.* 267 id. 142, and *People* v. *Illinois Central Railroad Co.* 266 id. 126.

The question of the establishment of a working cash fund plan as a means by which it should be made certain that the municipalities would be able to meet their ordinary expenses as they became due either in lieu of or in connection with the use of tax anticipation warrants, is a question of sound business judgment. The legislature decided that the working cash fund plan should be adopted and the tax anticipation warrant plan should be continued. The working cash fund plan is within the principle announced by this court in the various decisions which have been cited. When it is in full operation there will be no occasion for the use of tax anticipation warrants, but until that time the municipalities will continue to use the tax anticipation warrant plan so far as it may be necessary.

In the City act and County act it is provided that "to the extent that at any time moneys are available in the working cash fund they shall be transferred to the general corporate fund and disbursed for the payment of salaries and other corporate expenses so as to avoid, whenever possible, the issuance of tax anticipation warrants." In the amendment to the School law is a corresponding provision for the transfer to the educational purposes fund moneys at any time available in the working cash fund so as to avoid the issuance of tax anticipation warrants. The laws provide that the working cash fund shall be applied to the general corporate purposes of the municipalities to the exclusion of the use of tax anticipation warrants so long as there is any money in the working cash funds, thus remov-

ing the danger of an accumulation of idle money in the working cash funds.

It is contended by the appellant that the provisions of these acts are so vague, uncertain and arbitrary that it is impossible to discover in them any definite limitation on the amounts that may be accumulated in these working cash funds. The amount of taxes and the rate of taxation are exclusively for the General Assembly and may be increased or decreased at its pleasure. The exercise of its discretion cannot be controlled by the court. (*People* v. *Board of Review,* 290 Ill. 467.) The acts do not limit the amount of money which may be included in these working cash funds except by the limitation of the amount which may be levied annually to raise them, but the fund is in each case for the purpose of enabling such municipality "to have in its treasury at all times sufficient money to meet demands thereon for ordinary and necessary expenditures for corporate purposes." The amount that may be levied is left to the sound discretion and business judgment of the city council, the county board or the board of education. It is impossible to establish by a fixed, unchanging rule the amount which may be necessary for the purposes indicated. A maximum tax rate is fixed as the limit beyond which the taxing body may not go, and such a rate is fixed in each one of these acts. If the maximum tax rate should turn out to produce a larger amount than is necessary for the purposes of the law, it is not to be presumed that the taxing authorities would levy such maximum rate or any rate higher than the exigencies of the situation demand. If, contrary to this presumption, such a levy should be made, the courts have the power to interfere and prevent a clear abuse by such authorities of their discretionary powers. *People* v. *Chicago and Alton Railroad Co.* 324 Ill. 179.

It is contended on behalf of the appellant that the act concerning the board of education is inoperative and void because it is impossible to determine whether the bonds

provided for are obligations of the city of Chicago or the board of education of the city of Chicago. There is no uncertainty about the obligation of these bonds. In 1917 there was a complete revision of the School law relating to cities exceeding 100,000 inhabitants. Before that time the board of education, having twenty-one members appointed by the mayor by and with the consent of the common council, had charge and control of the public schools in such city, with certain powers to be exercised with the concurrence of the city council and other powers to be exercised independently. The act of 1917 reduced the power to the city council in relation to schools and created the board of education—a body politic and corporate. The corporation was authorized to acquire, by purchase, condemnation or otherwise, real estate for school purposes, but condemnation proceedings for the purpose of acquiring such property were to be conducted in the name of the city, in trust for the use of schools, and the title to all real estate held for the use of the schools was to be held in the name of the city, in trust for the use of schools. When there was not sufficient money in the treasury to meet the ordinary expenses for educational and building purposes the board of education was authorized to request the city council, whose duty it should thereupon become, to order issued warrants against and in anticipation of any taxes levied for the payment of the expenditures for educational and for building purposes. All money raised by taxation or received from the State common school fund, or from any other source for school purposes, was required to be held by the city treasurer *ex-officio* as school treasurer. The board of education was not authorized to levy or collect any tax, but the city council was required, under the direction of the board of education, to levy all school taxes annually. The amendment of section 134½ of the School law, which created the fund known as the working cash fund and is under consideration here, provided that for the purpose of creating such fund

the board of education, with the consent of the city council, may incur indebtedness and issue bonds therefor in an amount or amounts not exceeding in the aggregate $25,-000,000, to bear interest at the rate of not more than four percentum per annum and not more than half of the aggregate amount authorized to be issued and sold in any calendar year. It provided further that whenever the board of education desired to issue the bonds it should adopt a resolution designating the purpose and fixing the amount of the bonds proposed to be issued, the maturity thereof, the rate of interest thereon, and the amount of taxes to be levied annually for the purpose of paying the interest upon and the principal of such bonds. The bonds were required to be issued in the corporate name of the school district, to be signed by the president and secretary of the board and countersigned by the mayor and comptroller, or city clerk if there was no comptroller. They were required to be sold by the city comptroller, or city clerk if there should be no comptroller, under the direction of the board of education, and the proceeds thereof to be received by the city treasurer as school treasurer, and the board of education and the city council were authorized to provide that the resolution or resolutions and the ordinance or ordinances authorizing the issuance of such bonds should be operative, effective and valid without submission to the voters of the school district or city for approval.

The bonds required the concurrence and joint action of the board of education and the city for their issue and sale. They were required to be signed by the president and secretary of the board of education, sold by the comptroller of the city under the direction of the board of education, and the proceeds to be received by the city treasurer as school treasurer. The execution of the bonds by the mayor and the comptroller or city clerk had no other purpose than to show the city's consent to the issue. The action of the city comptroller, under the direction of the board of educa-

tion, was the action of the board of education. The proceeds of the bonds were paid to the city treasurer as *ex-officio* treasurer of the board of education, and there is no reason to doubt that the bonds were the obligation of the board of education. The legislature by this act expressly conferred upon the board of education the power to execute the bonds. . The decree of the circuit court is affirmed.

*Decree affirmed.*