(Nos. 31808 and 31811, cons.—

THE PEOPLE *ex rel.* Louis E. Nelson, County Collector, Appellee, *vs.* ANNING-JOHNSON COMPANY, Appellant.— THE PEOPLE *ex rel.* Louis E. Nelson, County Collector, Appellee, *vs.* JOHN A. MONSON, Appellant.

*Opinion filed January 18, 1951.*

BARR, BARR & COCHRAN, HOLT & KEARNEY, and MAC-LEISH, SPRAY, PRICE & UNDERWOOD, all of Chicago, for appellant Anning-Johnson Company; and ADELBERT BROWN, of Chicago, for appellant John A. Monson.

John S. Boyle, State's Attorney, Frank R. Schneberger, Joseph H. O'Connor, and Kirkland, Fleming, Green, Martin & Ellis, all of Chicago, (Joseph B. Fleming, Thomas M. Thomas, and Thomas F. Scully, of counsel,) for appellee.

Mr. Chief Justice Simpson delivered the opinion of court:

These causes, which we have consolidated for review, are brought here from the county court of Cook County by John A. Monson, who unsuccessfully objected to a portion of the 1946 taxes levied for the educational fund of the board of education of the city of Chicago, and by Anning-Johnson Company, a corporation, whose similar objection to 1947 taxes for the same fund was overruled. For convenience the appellants shall hereafter be referred to as "objectors," the appellee as "collector," and the board of education as the "Board." The sole issue created by the objections is whether the Board was empowered to create a working cash fund in excess of $40,000,000, and, if so, whether it presently has authority to maintain the fund in excess of that figure.

During the period from 1930 to 1935, the Board created a working cash fund of $47,751,209.28 by the sale of bonds and a direct tax, under legislative authority which will be discussed later. The need, purpose and practical value of the working cash fund for a board of education was discussed in *Mathews* v. *City of Chicago,* 342 Ill. 120, wherein the initial legislation relative to its establishment was held valid. Since the creation of the fund, advances or transfers of money have been made from it to the educational fund as the need arose. Each advance was made in anticipation of the collection of educational fund taxes for a particular year, and it was to be repaid to the working cash fund, (after payment of tax anticipation warrants,) upon receipt of taxes levied for such year, thus

maintaining the working cash fund at its level of $47,751,-209.28. The process seems to have operated with little or no objection until the present litigation.

Contending that the Board lacked authority to create or maintain a cash fund in excess of $40,000,000, Monson objects that the education fund's 1946 appropriation and levy of $37,838,211.41 to repay advances to the cash fund, is excessive and illegal in the amount of $7,732,576.37 because to such extent it produced an amount in the working cash fund in excess of $40,000,000. On the same theory the Anning-Johnson Company objected to a sum of $7,751,209.28 of the 1947 educational fund appropriation and levy of $37,483,046.97 for repayment of advances from the working cash fund.

Our first consideration must be directed to the contention that the Board was not authorized in the first instance to create a cash fund in excess of $40,000,000. This argument of the objectors is bottomed largely on their assertion that prior to the adoption of the 1945 School Code the working cash fund statutes were ambiguous and uncertain. The fund was initiated pursuant to an act of the special legislative session of 1930 which provided in part: "134½. * * * For the purpose of creating such fund, the board of education, with the consent of the city council of such city expressed by ordinance, may incur an indebtedness and issue bonds therefor in an amount or amounts not exceeding in the aggregate twenty-five million dollars ($25,000,000). Said bonds shall bear interest at a rate of not more than four (4) per centum per annum." (Ill. Rev. Stat. 1931, chap. 122, par. 157a.) This act was sustained against constitutional objections in *Mathews* v. *City of Chicago*, 342 Ill. 120, and thereupon the Board, in 1930 and 1931, issued and sold $25,000,000 in bonds which produced $24,531,092.65 for the working cash fund.

In 1933, the legislature enacted section 134¾ of the School Law, (Ill. Rev. Stat. 1933, chap. 122, par. 157b,)

which prescribed that: "In all cases where the board of education in cities having a population exceeding 500,000 inhabitants shall have created a working cash fund, pursuant to section 134½ * * *, the board of education * * * may incur an indebtedness for the purpose of increasing such working cash fund and issue bonds therefor in an amount not exceeding forty million dollars ($40,000,000.00). Such bonds shall bear interest at the rate of not more than five per centum (5%) per annum." The section concluded: "The authority herein granted shall be considered as cumulative authority for the issuance of bonds, and shall not be held to repeal any existing law with respect thereto." In *Board of Education* v. *Upham,* 357 Ill. 263, this court awarded a writ of *mandamus* compelling the city comptroller to approve the sale of $25,000,000 in new working cash fund bonds under the 1933 amendment, *i.e.,* section 134¾ of the School Law. The sale of bonds under this amendment totalled $22,-300,000, which, when added to the $25,000,000 issued under section 134½, made a total of $47,300,000 in bonds for working cash fund purposes.

The working cash fund was again before this court in *People ex rel. Lindheimer* v. *Huron & Orleans Building Corp.* 368 Ill. 469, where we recognized the propriety of the levy of a direct tax to raise funds for working cash fund purposes, for that portion of the amount authorized by section 134¾ for which bonds had not been sold.

It is the objectors' contention that section 134¾ is uncertain and ambiguous in that it is not clear whether the legislature authorized the issuance of bonds in the aggregate amount of $40,000,000, or whether it authorized an additional $40,000,000 which, when added to the bonds authorized in section 134½, would produce a total fund of $65,000,000. They urge, that while this court, in the three previous decisions referred to, has construed section 134¾ in connection with the means which could be em-

ployed to increase the fund, the amount of increase therein authorized has not been at issue prior to this proceeding. The collector, for his part, finds the meaning of the statute clear and certain, and insists that while the amount of the fund increase may not have been directly presented to this court in the *Upham* and *Huron & Orleans cases,* an interpretation of that question was a necessary adjunct to a determination of the issues that were raised, and that such an interpretation was made.

We are inclined to agree with the collector. While the issues raised in the previous working cash fund cases may differ from those raised here, they meet on common ground, in that their solution must unavoidably be based upon this court's construction of the pertinent statutes. In the *Upham case,* this court authorized the issuance of $25,000,000 additional in bonds under the authority of section 134¾, in face of the recognition that the Board had already sold $25,000,000 in bonds by virtue of the power given it by section 134½. The decision necessarily compelled the approval of working fund bonds in the amount of $50,000,000. That the interpretation of the statute, as it bore on the issues raised, was made with an eye to the total amount authorized for the working cash fund is borne out by the attention called to the facts that the funds raised under section 134½ were exhausted and inadequate; that $25,000,000 was needed for payment of the current school year expenses; and that $28,000,000 was needed for expenses in arrears. Indeed, the court's attention was directly turned to the total amount of the fund by an objection that the sale of bonds under section 134¾ would provide an unnecessary accumulation of money in the public treasury. We are of the opinion that the construction placed upon the statute by the court in that case, as it is reflected in the result reached, not only may, but must, serve as a guide in considering the constructions urged by the parties in this case.

The same is true to a greater extent of the decision in the *Huron & Orleans case*. There, after detailing each step of the legislature and of the school board, and giving especial attention to the construction of the working cash fund statutes, the opinion recognized that $25,000,000 in bonds had been sold under section 134½; and $22,300,000 under section 134¾, yet upheld a direct tax for the purpose of raising funds authorized by the latter section, which had not been raised by the sale of bonds. Such a decision could only have been arrived at, when $47,300,000 in bonds had already been sold, by construing sections 134½ and 134¾ as authorizing a fund in excess of $40,000,000.

Apart from the previous decisions involving the construction of the statutes, we think the legislative intent to allow an additional $40,000,000 in bonds under section 134¾, rather than an aggregate of that amount, is borne out somewhat by the fact that the bonds authorized under section 134½ were to bear interest of four percent, while section 134¾ authorized interest at five percent. If the $40,000,000 authorized by section 134¾ were meant to include the $25,000,000 authorized by section 134½, there would be an overlapping of interest provisions in respect to at least $15,000,000 worth of the bonds. The stated purpose of section 134¾ was to increase the working cash fund, and the legislature took special efforts to state that the bond issues were cumulative, and that section 134¾ should repeal no existing law. These features, when compared with the practical aspects of the situation as recognized in the *Upham case, i.e.,* that the Board needed $25,000,000 for the current year of 1933, and was in arrears $28,000,000 for salaries and expenses for other years, are indicative of the legislative intent to allow a working cash fund in excess of $40,000,000. While this court stated in the *Huron & Orleans case* that the statutes were not as clear as they should be, it was also concluded that its interpretations, the effects of which had been to

allow the creation of a fund in excess of $40,000,000, were sound and a reflection of the legislative intent.

Holding, as we do, that the assets of the working cash fund were properly acquired, and that it was the intent of the legislature under the laws then existing to authorize the Board to create a cash fund in excess of $40,000,000, makes it unnecessary for us to follow the objectors' suggestion that we look to subsequent statutes to determine the legislative intent when section 134¾ was enacted. There remains, however, the question of whether subsequent legislation, namely the School Code of 1945, now limits the amount of the working cash fund that can be maintained to $40,000,000.

In 1945, a commission appointed by the legislature presented a codification of the school laws of Illinois, which was enacted into law. (Laws of 1945, p. 1331.) The code was in effect when the disputed appropriation and tax levy ordinances for 1946 and 1947 were adopted. Sections 34-34 to 34-40, inclusive, of the code (Ill. Rev. Stat. 1945, chap. 122, pars. 34-34 to 34-40,) are a re-enactment of the former section 134½ and, for all practical purposes, the language is identical. The new sections provide that the Board is authorized to establish a working cash fund of $25,000,000 and further provide how it is to be created, maintained and administered. Section 34-61 of the code is a re-enactment of section 189¼ of the School Law, (Ill. Rev. Stat. 1935, chap. 122, par. 313(2),) which, when read with other portions of the code, authorizes that the amount authorized for the working cash fund may be raised by a direct tax levy as well as by the issue and sale of bonds.

Sections 34-41 to 34-45, inclusive, of the code, which are sections over which the chief controversy arises, correspond to the former sections 134¾. The relevant difference between the two appears in section 34-41, which now reads as follows: "Where the board has created a

working cash fund pursuant to sections 34-34 to 34-40, inclusive, it may, with the consent of the city council expressed by ordinance, incur an indebtedness for the purpose of increasing such fund and issue bonds therefor in an amount not exceeding forty million dollars ($40,000,-000.00) *including the bonds issued under Sections 34-34 to 34-40, inclusive,"* etc. The words emphasized were added to the code version of the School Law. Since the legislature used such language in view of the interpretation placed on section 134¾ by this court, and in face of the fact that the Chicago board had already sold bonds and created a fund in excess of $40,000,000, the section must be viewed as amendatory rather than being a clarification of the prior existing statutes relating to the creation of working cash funds, and subject to construction as such. There remains to be determined whether the section and those related to it, can be said to have the retroactive effect of reducing the $47,751,209.28 fund which the Board has already validly established in this case.

It is conceded that the School Law with relation to the methods in which the fund was to be administered was unaffected by the 1945 codification. As we read the act, all sections relating to the segregation of funds, the transfer to and repayment by the educational fund remain unaltered. The language of section 134½ which permitted a fund of $25,000,000 and of the provisions of section 134¾ which allow an increase in the fund established under section 134½, is unchanged. The only alteration is, that the Board is now deterred from issuing working cash fund bonds in excess of $40,000,000. The language used effectively deprives the Board from issuing the additonal $17,000,000 in bonds which were authorized under the previous statutes, and which power of the Board was commented on in the *Huron & Orleans case*. We find nothing in the language used, or in the administrative methods adhered to, which may be construed as a direction

that the code have the retroactive effect of reducing the fund already validly established. A statute will be presumed to operate prospectively, only, and will not be construed to have retroactive operation unless the language employed is so clear that it will admit of no other construction. (*People* v. *Panczko,* 390 Ill. 398; *People ex rel. Mereness* v. *Board of Education,* 349 Ill. 291.) Should the legislature desire to expressly direct the reduction of the existing fund, it is, of course, within their power to do so, but no such inference can be said to arise from the School Code as it exists.

Proper administration of the working cash fund required the Board, in the years 1946 and 1947, to appropriate and levy for the full amounts advanced to the educational fund. For the reasons stated, we are of the opinion that the county court properly overruled the separate objections made by the objectors to the taxes for those years, and its judgments are affirmed.

*Judgments affirmed.*