117 Ill. App.3d 14 (1983)
452 N.E.2d 760
In re APPLICATION OF PEOPLE ex rel. AUDREY WALGENBACH, COUNTY COLLECTOR  (School District No. 158, McHenry County, et al., Plaintiffs-Appellees,
v.
Palatine National Bank, Trust No. 953, et al., Defendants-Appellants).
No. 82-818.
Illinois Appellate Court  Second District.
Opinion filed August 3, 1983.
Richard J. Szura, of Abbamonto, Szura & Binder, of Cary, for appellants.
*15 Allyn J. Franke, of Brydges, Riseborough, Morris, Franke & Miller, of Chicago, for appellees.
Judgment reversed.
JUSTICE UNVERZAGT delivered the opinion of the court:
Defendants, tax objectors, appeal from a McHenry County circuit court judgment which interprets section 20-2 of the School Code (Ill. Rev. Stat. 1981, ch. 122, par. 20-2) to allow a school district to incur an indebtedness and issue bonds as evidence thereof to increase the amount of money in the school district's existing working cash fund. Section 20-2 provides, "For the purpose of creating a working cash fund, the school board of any such district may incur an indebtedness and issue bonds as evidence thereof * * *." (Emphasis added.)
The boards of education for School Districts Nos. 158 and 200 levied property taxes to pay the principal and interest for working cash fund bonds issued to increase the amount of their existing working cash funds. District No. 158 issued $425,000 in bonds on September 1, 1978, when it had $12,037 remaining in its working cash fund; District No. 200 issued $1,650,000 in bonds on December 1, 1978, when it had $54,704 in its working cash fund. Defendants objected to these tax levies on their property in McHenry County for 1979 and to the entry of a judgment fixing the correct amount of their property tax in a sum in excess of the amount to which no objections were made. Defendants argued that since the school districts previously created working cash funds, they could not issue new bonds to replenish their funds and thus could not levy new taxes to pay the principal and interest on those bonds.
The trial court rejected defendants' arguments finding that the school boards could issue new bonds to produce new funds as required and denied the defendants' objections. Defendants appealed.
Article 20 of the School Code authorizes school districts with populations less than 500,000 inhabitants to create, maintain, and administer working cash funds to enable "the district to have in its treasury at all time sufficient money to meet demands thereon for ordinary and necessary expenditures * * *." (Ill. Rev. Stat. 1981, ch. 122, par. 20-1.) "For the purpose of creating" this fund, the school board of the district may incur an indebtedness and issue bonds as evidence thereof in an amount limited by a specified formula; before or at the same time that the bonds are issued, the school board must levy a direct annual property tax to generate sufficient money to pay the principal and interest on the bonds. (Ill. Rev. Stat. 1981, ch. 122, par. 20-2.) To issue bonds, the school board must adopt a resolution of its intent to do so and publish notice of this intent; if 20% or more of the *16 voters petition that the proposition be submitted to a vote, an election must be held and the proposition must receive majority support. (Ill. Rev. Stat. 1981, ch. 122, par. 20-7.) To provide money for the fund, the school board may also levy annually a working cash fund property tax. Ill. Rev. Stat. 1981, ch. 122, par. 20-3.
Sections 20-4 and 20-5 of the School Code direct and limit the use of the working cash fund by establishing a reimbursement procedure whereby money borrowed from the fund to pay necessary and ordinary expenditures is replaced with money that is collected by taxes or otherwise for the purposes to which the fund money had been borrowed. (Ill. Rev. Stat. 1981, ch. 122, pars. 20-4, 20-5.) The fund may be abolished by resolution of the school board. (Ill. Rev. Stat. 1981, ch. 122, par. 20-8.) A school district which has abolished or abated its fund may create a new one. Ill. Rev. Stat. 1981, ch. 122, par. 20-9.
Defendants argue that the phrase "[f]or the purpose of creating" a fund found in section 20-2 limits a school board's authority to issue bonds only to create the fund, not to increase the amount of money in it. The school districts respond that the word "create" has a broader meaning than to establish as in the sense of an original inception; rather, according to the districts, it means to achieve different levels in the fund through a series of steps which increase the amount of the fund. They further argue that construing the section as defendants advocate would defeat the legislature's intent and lead to an absurd result which, if taken to its logical conclusion, would prohibit a school district with only $1 remaining in its fund from issuing new bonds but allowing a school district without any money remaining in its fund to recreate a fund and issue bonds in any amount.
 1 The first canon of statutory interpretation is to ascertain and give effect to the legislative intent as expressed in the statute. (City of East Peoria v. Group Five Development Co. (1981), 87 Ill.2d 42, 46.) Provisions of a statute should be read in light of the statute as a whole. (Winks v. Board of Education (1979), 78 Ill.2d 128, 135.) The legislative intent usually appears from a consideration of the statute's language which affords the best means of its exposition. (Illinois Power Co. v. Mahin (1978), 72 Ill.2d 189, 194.) The words used in a statute are assumed to have been intended to retain their ordinary and popularly understood meaning. (Kozak v. Retirement Board (1983), 95 Ill.2d 211, 215.) If the legislative intent can be ascertained from the language of the statute, the language prevails and will be given effect; a court may not declare that the legislature did not mean what the plain language of the statute imports. Western National *17 Bank v. Village of Kildeer (1960), 19 Ill.2d 342, 350.
 2, 3 A court, however, is not bound by the literal language found in a statute where the language would defeat the legislature's obvious and clearly expressed objective or purpose. (People v. McCoy (1976), 63 Ill.2d 40, 45.) Words may thus be modified, altered, or supplied to obviate repugnancies or inconsistencies with the legislative intent. (People v. Bratcher (1976), 63 Ill.2d 534, 543.) As this court stated in People v. Gibson (1981), 99 Ill. App.3d 616, "courts are generally cautious about adding words to a statute, [but] * * * will read into the meaning of a statutory provision a qualifying or expanding expression [which is] plainly implied by the general context of the enactment, which has been palpably omitted and which is essential to prevent the legislative purpose from failing in one of its important aspects." (99 Ill. App.3d 616, 620.) Where two constructions of a law are available, the one which would produce absurd results and render the operation of the law difficult should be avoided. Balmes v. HIABFOCO, A.B. (1982), 105 Ill. App.3d 572, 575.
The present statute is unambiguous. The word "create" means to bring into being, to cause to exist, or to produce. (Black's Law Dictionary 330 (5th ed. 1979).) For purposes of bringing into existence a fund where one does not exist, the statute authorizes the school board to incur an indebtedness and issue bonds as evidence of this indebtedness. It does not authorize a school board to later increase its indebtedness and issue new bonds once the fund already exists. Contrary to the school districts' assertions, this construction comports with the legislative intent as expressed in article 20 of the School Code.
Reading article 20 as a whole reveals the legislature's intent of stabilizing school finances by authorizing a school board to establish an internal source whereby a school may borrow money to pay for its ordinary and necessary expenditures. (Schwartz, Illinois School Finance  A Primer, 56 Chi-Kent L. Rev. 831, 849, 856 (1980).) The reimbursement procedure requiring school boards to replace money borrowed from the fund with revenue collected for the specific purpose for which the fund money was applied creates a revolving fund. (Mathews v. City of Chicago (1930), 342 Ill. 120.) This procedure evinces that the legislature contemplated that the amount of money in the fund would not be depleted but rather would remain fairly constant.
 4 While article 20 provides that the initial source of the fund would come from the issuance of bonds, the legislature apparently recognized that the amount of money in the fund may become inadequate and thus provided two remedies. Section 20-3 allows a school *18 board to levy annually a working cash fund tax in a prescribed formula. (Ill. Rev. Stat. 1981, ch. 122, par. 20-3.) This levy constitutes the only means to increase the amount of money in an existing fund. In Mathews v. City of Chicago (1930), 342 Ill. 120, the supreme court explained this procedure where it stated:
"The raising of a fund by the sale of bonds to meet the deficit and the establishment from the proceeds of such sale of a revolving fund, to be increased from time to time, if necessary, by a levy of taxes, may be a novel scheme, but it is not different in principle from the raising each successive year of a fund for the same purpose by borrowing money by means of anticipation warrants." 342 Ill. 120, 137.
Should the amount that could be levied under the formula set forth in that section prove insufficient to meet the needs of the school board, the school board may abolish the fund (Ill. Rev. Stat. 1981, ch. 122, par. 20-8), and then create a new one (Ill. Rev. Stat. 1981, ch. 122, par. 20-9). That the legislature intended this latter procedure may be inferred from its adding of section 20-9 to article 20 after the Illinois Supreme Court noted, but did not address, an appellant's objections to the article based upon the hypothesis that a board could annually create and abolish a fund. (See Bell v. School District No. 84 (1950), 407 Ill. 406, 414.) Section 20-9, added to the article in 1967, provides that, "Nothing in this Article prevents a school district which has abolished or abated its working cash fund from again creating a working cash fund in the manner provided in this Article." Ill. Rev. Stat. 1981, ch. 122, par. 20-9; see Schwartz, Illinois School Finance  A Primer, 56 Chi-Kent L. Rev. 831, 856-57 (1980).
A comparison of other statutes which authorize working cash funds supports the conclusion that bonds under the present section may be issued only when the school district initially creates the fund. Section 3-33.2 of the Public Community College Act provides:
"In order to create, maintain or increase such a working cash fund * * * the board * * * may incur an indebtedness * * * and issue bonds therefor from time to time * * *." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 122, par. 103-33.2.)
Similarly, section 34-31 of the School Code allows a board for a school district having a population in excess of 500,000 inhabitants to issue bonds to increase the working cash fund. (Ill. Rev. Stat. 1981, ch. 122, par. 34-31.) These two statutes reveal that the legislature could have specified that bonds may be issued to increase the amount of money in a fund but decided not to do so for school districts which have populations less than 500,000 inhabitants. Other statutes which *19 authorize working cash funds either imitate the instant statute (see Ill. Rev. Stat. 1981, ch. 96 1/2, par. 6431 (forest preserves); Ill. Rev. Stat. 1981, ch. 96 1/2, par. 6445.2 (zoological parks); Ill. Rev. Stat. 1981, ch. 34, par. 2052 (counties); Ill. Rev. Stat. 1981, ch. 24, pars. 8-6-2, 8-7-2 (cities)), or authorize only tax levys, and not the issuance of bonds, to provide money for the fund (see Ill. Rev. Stat. 1981, ch. 105, par. 11.2-2 (park districts); Ill. Rev. Stat. 1981, ch. 34, par. 2074 (downstate counties)). All of these statutes evince a conscious effort by the legislature to devise different plans by which working cash funds may be created and funded depending on the particular circumstances and needs of the entity.
Thus, contrary to the districts' assertions on appeal, the purpose of this article to enable school districts to have at all times sufficient money to meet ordinary and necessary expenditures (Ill. Rev. Stat. 1981, ch. 122, par. 20-1) is not defeated by this interpretation of the word "create." The school district can levy annually a tax to increase the fund or abolish the fund and create a new one. Similarly, this interpretation serves to remedy the evil intended to be remedied and to attain the object sought by the legislature: to stabilize the finances of school districts.
In arguing that "create" encompasses the act of increasing the fund, the school districts rely on People ex rel. Reynolds v. Atchison, Topeka & Santa Fe Ry. Co. (1921), 300 Ill. 415. In that case, the court addressed the issue of whether a tax levy to pay for the establishment and maintenance of a detention home needed to separate the items for its establishment from those for its maintenance. The court found that "to establish" meant "to create, to institute, to build * * * [and a tax levy to establish] a detention home would include purchasing, erecting, leasing and otherwise providing, and such tax could be used to enlarge, improve or add to such home * * *." 300 Ill. 415, 417.) The court continued that to "maintain" meant those things having to do with carrying on the business for which the home was built or established. 300 Ill. 415, 417.
While the court's interpretation of "create" may include the act of "enlarging" the fund, the difference in the nature of a detention home and of a fund makes that definition inappropriate. An increase in the amount of money in a fund does not change the fund, it merely changes what is in the fund. On the other hand, an improvement to a detention home changes the very structure of the home by creating a new part to it. Furthermore, the court in that case sought to compare the words "establishment" and "maintenance," which narrows the applicability of the court's definition. Finally, while the word "established" *20 may include within its meaning the act of creating, the inverse does not necessarily follow. See Webster's Third New International Dictionary 532, 778 (1966).
The school districts' reliance on Davidson v. Lanier (1866), 71 U.S. (4 Wall.) 447, 18 L.Ed. 377, wherein the Supreme Court interpreted the meaning of "to erect, establish, institute or put in operation" to mean more than just the commencement, is misplaced. In Davidson, the court sought to determine the conduct prohibited by this phrase and thus focused on all four parts in arriving at its conclusion.
The school districts further argue that other language in the article indicates that the legislature intended more than one bond issue and emphasize these phrases in quoting sections of the article in their brief:
"such district may * * * issue bonds * * * in an amount or amounts not exceeding in the aggregate 75% of the taxes permitted to be levied for educational purposes for the then current year * * *." (Emphasis supplied by school districts.)
The legislature's use of the phrases "amount or amounts" and "aggregate" does not mean that the legislature contemplated more than one bond issue; rather, it may mean that one bond issue may contain bonds in various amounts. The word "then" does not mean that several bond issues are authorized; rather, it defines the base year for determining the aggregate amount of the bond issue pursuant to the established formula when a school district decides to create a working cash fund. Furthermore, this language may represent a legislative authorization that the issuance of bonds be in a series as opposed to the issuance of bonds just at one time. See Black's Law Dictionary 163 (5th ed. 1979) (series bonds means groups of bonds issued at different times but for the same indenture).
The school districts attempt to explain the rationale for the legislature's specific authorization in section 34-31 of the School Code allowing certain school boards to issue bonds to increase their working cash fund as merely a necessary provision added to the School Code when the General Assembly increased the amount of money which a school district could place in a working cash fund. However, if the school districts' interpretation of the word "create" is correct, no such new provision would have been needed. Furthermore, this explanation does not explain why the General Assembly used the word "increase" in the Public Community College Act (Ill. Rev. Stat. 1981, ch. 122, par. 103-33.2).
Finally, the school districts contend that the legislative history of *21 working cash funds supports the trial court's judgment. Directing this court to a 1930 statute which originally established a working cash fund for the board of education of the city of Chicago, they urge that that statute's requirement that "[n]ot more than fifty (50) per centum of the aggregate amount of bonds herein authorized shall be issued and sold in any calendar year" indicates that more than one bond issue was contemplated. However, this requirement merely indicates that when a school board determines to create a fund, it may authorize bonds for the indebtedness to be incurred but that the bonds may be issued and sold at different times. Indeed, Black's Law Dictionary defines "series bonds" to mean groups of bonds issued at different times but for the same indenture (Black's Law Dictionary 163 (5th ed. 1979)). Thus, such language does not mean that a school board may incur an additional indebtedness and issue additional bonds to increase the money in the fund.
 5 The trial court's interpretation of the word "create" to mean to produce additional funds misreads the statute. The creating of the fund is a single act. Only for that purpose may bonds be issued. The only method to produce additional funds is by a tax levy.
The judgment of the circuit court of McHenry County is reversed.
Reversed.
NASH and VAN DEUSEN, JJ., concur.