# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Barrett v. Henry*, 2013 IL App (2d) 120829

---

| | |
|---|---|
| Appellate Court Caption | DIANNE BARRETT and JOSEPH BARRETT, Plaintiffs-Appellants, v. GWEN HENRY, County Treasurer and *ex officio* County Collector of Du Page County, Illinois, Defendant-Appellee.–DIANNE BARRETT and JOSEPH BARRETT, Plaintiffs-Appellants, v. GWEN HENRY, County Treasurer and *ex officio* County Collector of Du Page County, Illinois, Defendant-Appellee. |
| District & No. | Second District<br>Docket Nos. 2-12-0829, 2-12-0830 cons. |
| Filed | April 17, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiffs' objections to a school district's issuance of general obligations bonds for working cash purposes were properly dismissed on the ground that plaintiffs failed to substantiate their conclusion that the district's working cash fund was sufficient to finance operations without issuing the bonds. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, Nos. 10-TO-7, 11-TO-12; the Hon. Paul M. Fullerton, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Dianne Barrett and Joseph Barrett, both of Clarendon Hills, appellants *pro se*.

Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman, Donna B. Pindel, and Edward R. Psenicka, Assistant State's Attorneys, of counsel), for appellee.

Panel     JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices Zenoff and Schostok concurred in the judgment and opinion.

## OPINION

¶ 1   Dianne and Joseph Barrett filed tax objection complaints against Gwen Henry, the treasurer and *ex officio* county collector of Du Page County (Collector), seeking refunds for portions of their 2009 and 2010 property taxes that were collected to make payments on bonds issued by Hinsdale Township High School District Number 86 (District).[1] The taxes in question were extended at a rate of $0.0373 per $100 of assessed property value in 2009 and $0.0301 per $100 of assessed property value in 2010. The taxes added $80.35 and $61.35 to the Barretts' property tax bills for 2009 and 2010, respectively. In their tax objection complaints, the Barretts argued that the District abused its discretion in issuing the bonds. In each case, the Collector moved to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2010)). The trial court granted the motions and the Barretts appealed. We consolidated the appeals and we now affirm.

¶ 2   According to the Barretts' objections, the District issued general obligation bonds in December 2002 (Series 2002 Bonds), October 2005 (Series 2005 Bonds), and November 2008 (Series 2008 Bonds). The final official statement for the Series 2002 Bonds indicated that they were issued for working cash purposes, including funding capital improvements to Hinsdale South High School and Hinsdale Central High School. The final official statement for the Series 2005 Bonds indicated that they were issued to increase the District's working cash fund for capital projects and to refund a portion of the Series 2002 Bonds. The final official statement for the Series 2008 Bonds indicated that the proceeds would be used to increase the District's working cash fund and that it was the intent of the District's board of education to use the funds to alter, repair, equip, and improve school buildings and facilities. According to the objections, the District's audited financial statements show that, in each of the fiscal years when the bonds were issued, the proceeds were deposited into the working

---

[1]The Barretts filed a separate complaint for each tax year.

cash fund and the District made a permanent transfer of funds from the working cash fund. The receipts of bond proceeds and transfers from the fund were as follows:

| Fiscal Year | Bond Proceeds | Transfers |
| --- | --- | --- |
| 2002-2003 | $ 13,030,000 | $ 13,030,000 |
| 2005-2006 | $ 2,300,764 | $ 3,267,416 |
| 2008-2009 | $ 3,980,000 | $ 4,000,000 |

¶ 3 During the period from June 30, 2002, through June 30, 2009, the working cash fund had the following end-of-year balances:

| Fiscal Year | End-Of-Year Balance |
| --- | --- |
| 2001-2002 | $4,564,831 |
| 2002-2003 | $5,364,941 |
| 2003-2004 | $8,303,747 |
| 2004-2005 | $7,752,850 |
| 2005-2006 | $7,106,552 |
| 2006-2007 | $6,713,691 |
| 2007-2008 | $7,022,189 |
| 2008-2009 | $7,279,499 |

¶ 4 As will be discussed at greater length below, a school district's working cash fund is designed to enable the district to finance operations during the period before the property taxes levied for that purpose have been collected. This method of financing serves as an alternative to the issuance of tax anticipation warrants. The Barretts argued that, when a school district has accumulated a working cash fund sufficient to finance the district's operations without the issuance of tax anticipation warrants, the district should not raise additional cash for the fund through the issuance of bonds. The Barretts thus contended that it was an abuse of discretion to issue the bonds, that the bonds were "illegal and void," and that "no authority existed for the levy or extension of taxes for the retirement [of the bonds]."

¶ 5 As noted, this appeal is before us for review of the trial court's rulings on motions to dismiss under section 2-619(a)(9) of the Code. Section 2-619 provides that, within the time for pleading, a defendant may move for involuntary dismissal of a claim on the basis of any of various enumerated defenses or, under subsection (a)(9), on the basis of "other affirmative matter avoiding the legal effect of or defeating the claim" (735 ILCS 5/2-619(a)(9) (West 2010)). For purposes of section 2-619(a)(9), affirmative matter "is something in the nature of a defense which negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994). Our review is *de novo*. *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 12 (2005). In support of her motions to dismiss, the Collector submitted documentary evidence showing that the bonds were issued in compliance with the applicable statutory requirements of public notice, a public hearing, and the adoption of a resolution authorizing the issuance of the bonds. She argued that the documents "defeat the [Barretts'] claim that [the bonds] were illegal, void and without

authority." She further disputed a critical conclusion of law in the Barretts' objections: the conclusion that a school district may raise cash for its working cash fund only to the point at which the fund is sufficient to allow the district to operate without issuing tax anticipation warrants. Accordingly, the Collector argued that the issuance of the bonds was not an abuse of discretion.

¶ 6 There is no dispute that the District complied with the statutory procedures for issuance of the bonds. The sole question raised in this appeal is whether issuance of the bonds was an abuse of discretion. We conclude that it was not, and the Collector's motions to dismiss were properly granted.

¶ 7 Article 20 of the School Code (105 ILCS 5/art. 20 (West 2002)) provides for the creation of working cash funds and governs the use of the funds. During the period when the bonds were issued, section 20-2 of the School Code provided, in pertinent part:

"For the purpose of creating a working cash fund, the school board of any such district may incur an indebtedness and issue bonds as evidence thereof in an amount or amounts not exceeding in the aggregate 85% of the taxes permitted to be levied for educational purposes for the then current year to be determined by multiplying the maximum educational tax rate applicable to such school district by the last assessed valuation as determined at the time of the issue of said bonds plus 85% of the last known entitlement of such district to taxes as by law now or hereafter enacted or amended, imposed by the General Assembly of the State of Illinois to replace revenue lost by units of local government and school districts as a result of the abolition of ad valorem personal property taxes, pursuant to Article IX, Section 5, paragraph (c) of the Constitution of the State of Illinois. *** The school board shall before or at the time of issuing the bonds provide for the collection of a direct annual tax upon all the taxable property within the district sufficient to pay the principal thereof at maturity and to pay the interest thereon as it falls due ***." 105 ILCS 5/20-2 (West 2002).[2]

¶ 8 Section 20-4 of the School Code provided, in pertinent part:

"Moneys derived from the issuance of bonds *** shall be used only for the purposes and in the manner hereinafter provided. *** Moneys in the fund shall not be used by the school board in any manner other than to provide moneys with which to meet ordinary and necessary disbursements for salaries and other school purposes and may be transferred in whole or in part to the general funds or both [*sic*] of the school district and disbursed therefrom in anticipation of the collection of taxes lawfully levied for any or all purposes, or in anticipation of such taxes as by law now or hereafter enacted or amended are imposed by the General Assembly of the State of Illinois to replace revenue lost by units of local government and school districts as a result of the abolition of ad valorem personal property taxes ***. Moneys so transferred to any other fund shall be deemed to be transferred in anticipation of the collection of that part of the taxes so levied or to be received which is in excess of the amount thereof required to pay [certain

---

[2]As an alternative to the issuance of bonds, a school district may levy taxes to raise working cash funds. See 105 ILCS 5/20-3 (West 2002).

other financial obligations].

Upon receipt by the school district of any taxes in anticipation of the collection whereof moneys of the working cash fund have been so transferred for disbursement, the fund shall immediately be reimbursed therefrom until the full amount so transferred has been retransferred to the fund." 105 ILCS 5/20-4 (West 2002).

¶ 9    When the bonds were issued, permanent transfers from a school district's working cash fund to its educational fund were permissible. See *G.I.S. Venture v. Novak*, 388 Ill. App. 3d 184 (2009). Such transfers were in the nature of an abatement of the working cash fund. *Id.* at 188-90. Section 20-10 of the School Code (105 ILCS 5/20-10 (West 2010)), which was added in 2010 (see Pub. Act 96-1277, § 5 (eff. July 26, 2010)), authorizes permanent transfers to "any fund or funds of the district most in need of the money" and validates such transfers that occurred before section 20-10 took effect.

¶ 10   The statutes at issue in this case are derived from section 134½ of "An Act to establish and maintain a system of free schools" (Ill. Rev. Stat. 1931, ch. 122, ¶ 157a). Commenting on that provision (and similar ones permitting cities and counties having certain populations to maintain working cash funds), our supreme court stated in *Mathews v. City of Chicago*, 342 Ill. 120, 125 (1930), that "the working cash fund constitutes a revolving fund from which money may be transferred to other funds in anticipation of taxes to be collected for the purposes of such other funds, to be re-paid later out of the taxes levied for such other funds when collected, and a method is provided enabling the municipality to do business on a cash basis by transferring money from the working cash fund to other funds during the time between the levy of taxes for such other funds and the collection of the taxes so levied." The *Mathews* court further explained:

"Under our law for the levy and collection of taxes the levies are made at various dates, usually in the months from March to September, including both. The taxes are not extended until December or until January or February of the next year, and the collection cannot proceed until the extension is completed. Liabilities accrue against the municipalities after the levies are made which must be met from the levies whose collection will not begin for several months. *** The greater part of the tax levied is not paid until a year or more after the levy, and for this reason a deficit arises in the treasury of every municipal corporation, which must be provided for if its credit is to be maintained and its warrants to be paid and not hawked about to be sold at a discount. Accordingly the legislature, to meet this situation, passed a law in 1879 *** providing for the issue of tax warrants whenever there was no money in the treasury to meet the ordinary and necessary expenses of any municipal corporation ***. [Citation.] *** The raising of a fund by the sale of bonds to meet the deficit and the establishment from the proceeds of such sale of a revolving fund *** is not different in principle from the raising each successive year of a fund for the same purpose by borrowing money by means of anticipation warrants." *Id.* at 136-37.

¶ 11   The *Mathews* court rejected a taxpayer's constitutional argument that accumulation of moneys in the working cash fund was not a public purpose within the scope of a school district's taxing power. The court concluded that it was not a proper objection that working

cash funds were "banking funds," *i.e.* that "the money is never expended or used in the sense that it is permanently applied to any particular corporate use." *Id.* at 138. The court reasoned as follows:

"The question of the establishment of a working cash fund plan as a means by which it should be made certain that the municipalities would be able to meet their ordinary expenses as they became due[,] either in lieu of or in connection with the use of tax anticipation warrants, is a question of sound business judgment. The legislature decided that the working cash fund plan should be adopted and the tax anticipation warrant plan should be continued. The working cash fund plan is within the principle announced by this court in the various decisions which have been cited. *When it is in full operation there will be no occasion for the use of tax anticipation warrants*, but until that time the municipalities will continue to use the tax anticipation warrant plan so far as it may be necessary." (Emphasis added.) *Id.* at 140.

¶ 12    The taxpayers in *Mathews* also objected that the General Assembly had put no limit on the amount that might be accumulated in a working cash fund. The court rejected the argument:

"The acts do not limit the amount of money which may be included in these working cash funds except by the limitation of the amount which may be levied annually to raise them, but the fund is in each case for the purpose of enabling such municipality 'to have in its treasury at all times sufficient money to meet demands thereon for ordinary and necessary expenditures for corporate purposes.' The amount that may be levied is left to the sound discretion and business judgment of the city council, the county board, or the board of education. It is impossible to establish by a fixed, unchanging rule the amount which may be necessary for the purposes indicated. A maximum tax rate is fixed as the limit beyond which the taxing body may not go, and such a rate is fixed in each one of these acts. If the maximum tax rate should turn out to produce a larger amount than is necessary for the purposes of the law, it is not to be presumed that the taxing authorities would levy such maximum rate or any rate higher than the exigencies of the situation demand. *If, contrary to this presumption, such a levy should be made, the courts have the power to interfere and prevent a clear abuse by such authorities of their discretionary powers*." (Emphasis added.) *Id.* at 141.

¶ 13    Relying primarily on *Mathews*, the Barretts contend that "[t]he clear intent of Article 20 of the School Code is that the district must first demonstrate that there has been a need for tax anticipation warrants in the most recent past or that there will be a continual need for tax anticipation warrants into the foreseeable future prior to 1) establishing a working cash fund and 2) increasing a working cash fund." We disagree. The statutes place no such limitation on a school district's authority to accumulate cash in its working cash fund. Nor can we extrapolate such a limitation from the *Mathews* court's observation that, when a school district's working cash fund is "in full operation," it will no longer be necessary to issue tax anticipation warrants. The *Mathews* court never suggested, as the Barretts seem to believe, that once the working cash fund is "fully operational" no additional cash may be raised. Although at that point increasing the fund might not be strictly necessary, it hardly follows that doing so is strictly forbidden. Rather, as stated in *Mathews*, there must be a *clear abuse*

-6-

*of discretion* before a court will interfere. That situation does not exist merely because a school district maintains a level of reserves in its working cash fund above what is necessary to cover temporary shortfalls in the district's other funds prior to the collection of taxes for the fiscal year.

¶ 14　　　In *Allegis Realty Investors v. Novak*, 379 Ill. App. 3d 636, 638 (2008), we described the process devised by our supreme court for determining whether a taxing body has abused its discretion by accumulating too much money in its treasury:

> "Our supreme court set forth the proper method for analyzing excess accumulations of money in *Central Illinois Public Service Co. v. Miller*, 42 Ill. 2d 542 (1969). In *Miller*, the court determined the total funds available for the fiscal year by adding the fund balance at the beginning of the fiscal year to the taxes extended for the prior year. This total was then divided by the average annual expenditure from the fund for the previous three fiscal years. In *Miller*, the total funds available were 2.84 times the annual average expenditure for the past three fiscal years and 3.24 times the amount expended in the last previous fiscal year. The court then concluded that any further tax levy would result in an illegal excess accumulation. However, the *Miller* test is not one to be applied with mathematical precision [citation], and the term 'accumulation' has been equated with an amount that exceeds two to three times the foreseeable expenditures of the taxing body. [Citation.] Once such an accumulation is shown, the taxing body is to be given an opportunity to present evidence showing the need for an accumulation of such magnitude."

¶ 15　　　This test allows maintenance of considerable reserves. From an analytical standpoint, it makes no difference that a portion of the reserves is maintained in a discrete fund. The *Miller* test described in *Allegis Realty Investors* is therefore applicable in this setting, the relevant question being whether, at the beginning of fiscal years when the bonds were issued, the balance of the district's funds (including the working cash fund) plus taxes extended for the prior year were two to three times the average annual expenditures from the preceding three years. The Barretts have not alleged that this is the case and have thus failed to substantiate the conclusion that it was an abuse of discretion to issue the bonds. Accordingly, their objections were properly dismissed.

¶ 16　　　For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 17　　　Affirmed.