# Illinois Official Reports

## Appellate Court

*1001 Ogden Avenue Partners v. Henry*, 2017 IL App (2d) 160838

| | |
|---|---|
| Appellate Court Caption | 1001 OGDEN AVENUE PARTNERS *et al.*, Plaintiffs-Appellants, v. GWEN HENRY, Du Page County Treasurer and *ex officio* Du Page County Collector, Defendant-Appellee (Bensenville Elementary School District No. 2, Itasca School District No. 10, Marquardt School District No. 15, Keeneyville Elementary School District No. 20, Benjamin School District No. 25, West Chicago Elementary School District No. 33, Villa Park School District No. 45, Butler School District No. 53, Darien School District No. 61, Hinsdale Township High School District No. 86, Du Page High School District No. 88, Carol Stream Community Consolidated School District No. 93, Fenton Community High School District No. 100, Lake Park Community High School District No. 108, Wheaton-Warrenville Community Unit School District No. 200, and Westmont Community Unit School District No. 201, Intervenors-Appellees). |
| District & No. | Second District<br>Docket No. 2-16-0838 |
| Filed | September 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 02-TO-15; the Hon. Paul M. Fullerton, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Evan B. Karnes II and Everardo Martinez, of Karnes Law, Chtrd., of Chicago, for appellants. |
|---|---|
| | Robert B. Berlin, State's Attorney, of Wheaton (Lisa A. Hoffman and Donna B. Pindel, Assistant State's Attorneys, of counsel), for appellee Gwen Henry. |
| | John M. Izzo, of Hauser Izzo, LLC, of Flossmoor, for appellee Hinsdale Township High School District No. 86. |
| | Ares G. Dalianis and Scott R. Metcalf, of Franczek Radelet, P.C., of Chicago, for appellee Itasca School District No. 10. |
| | Anthony R. Ficarelli, of Clausen Miller P.C., and Arsalan A. Nayani, of Hinshaw & Culbertson, both of Chicago, for appellee Fenton Community High School District No. 100. |
| | Alan M. Mullins, of Scariano, Himes & Petrarca, Chtrd., of Chicago, for appellee Benjamin School District No 25. |
| | James S. Levi and Steven M. Richart, of Hodges, Loizzi, Eisenhammer, Rodick & Kohn, LLP, of Arlington Heights, for appellee Keeneyville Elementary School District No. 20. |
| | Donald E. Renner III and John A. Wall, of Klein, Thorpe & Jenkins, Ltd., of Chicago for appellee Darien School District No. 61. |
| | Patrick J. Canna and Dawn M. Hinkle, of Canna & Canna Ltd., of Orland Park, for appellees Bensenville Elementary School District No. 2, Marquardt School District No. 15, and Carol Stream Community Consolidated School District No. 93. |
| | Heidi A. Katz, of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Chicago, for other appellees. |

| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices McLaren and Jorgensen concurred in the judgment and opinion. |
|---|---|

**OPINION**

¶ 1 Plaintiffs, 1001 Ogden Avenue Partners *et al.* (taxpayers),[1] appeal from the Du Page County circuit court's order granting summary judgment in favor of defendant, Gwen Henry, the Du Page County treasurer and *ex officio* Du Page County collector, as well as 16 intervening school districts (collectively, School Districts) on tax-rate objections spanning 11 years. For the reasons that follow, we affirm.

¶ 2 <center>I. BACKGROUND</center>

¶ 3 From tax years 2001 through 2012, the School Districts each issued working-cash-fund bonds under article 20 of the School Code (105 ILCS 5/20-1 *et seq.* (West 2002)). The taxpayers filed objections in the trial court, challenging the validity of the taxes levied to pay the principal and interest on the working-cash-fund bonds. The objections included various ranges of tax years from 2001 through 2012, depending on the school district at issue. The objections alleged that the School Districts improperly issued the working-cash-fund bonds under article 20, because the "true purpose" of each bond issuance was to raise funds for building purposes. The taxpayers claimed that the School Districts were required to conduct a direct referendum under section 19-3 of the School Code (105 ILCS 5/19-3 (West 2002)) before issuing bonds for building purposes. They also claimed that a direct referendum was required under section 18-190 of the Property Tax Extension Limitation Law (35 ILCS 200/18-190 (West 2002)). The taxpayers ultimately argued that the taxes levied on the working-cash-fund bonds were illegal and void.

¶ 4 The School Districts moved to intervene, and the trial court consolidated the taxpayers' objections. Because the facts underlying each bond issuance were substantially the same, the consolidation allowed Itasca School District No. 10 (District 10), West Chicago Elementary School District No. 33, and Villa Park School District No. 45 to represent all of the School Districts. Defendant and the School Districts then filed a joint motion for summary judgment. The motion addressed the facts relating to the working-cash-fund bonds issued only by District 10 as representative of the facts concerning all of the School Districts.

¶ 5 The factual background concerning District 10's bond issuance was as follows. On December 13, 2006, District 10's board of education adopted a resolution declaring its intent to issue working-cash-fund bonds. Two days later, District 10 published in a newspaper of general circulation a notice of a public hearing and a notice of its intent to issue the bonds. The notices stated that District 10 was going to issue the bonds under article 20 for the purpose of increasing its working cash fund to allow it to have sufficient money for "corporate purposes." The notices also informed the public of the opportunity to submit within 30 days a petition signed by 524 voters of the district, requesting that a referendum be held on the bond issuance. On January 16, 2007, a "No Petition Certificate" was filed, evidencing that no petition had been filed by voters.

¶ 6 On February 14, 2007, District 10 adopted a bond resolution stating that the board was authorized to issue bonds totaling $2,685,000 under article 20 of the School Code; the proceeds were to be deposited into the working cash fund and "held apart, maintained and

---

[1]The individual names of the taxpayers do not appear in the record, so we use the phrase "*et al.*" to refer to them.

administered" under article 20 until the bonds were retired. The bond resolution further stated that it was the "present intention and reasonable expectation of the Board" that the bond proceeds would be used to "improve the sites of, build and equip additions to and alter, repair and equip the existing school buildings," after the funds were transferred to the appropriate operating fund in accordance with article 20.

¶ 7    The bonds were issued and titled "General Obligation Limited Tax School Bonds, Series 2007." The proceeds were deposited into District 10's working cash fund, known as the "Working Cash Fund of School District Number 10, DuPage County, Illinois." Following the issuance of the bonds, District 10 undertook a series of repair and maintenance projects at its schools. These projects included, but were not limited to, door replacements, roof maintenance, carpet replacement, ceiling repair, locker painting, gym floor repair/varnish, and toilet replacements. District 10 transferred or abated money from its working cash fund, including the proceeds of the 2007 bond issuance, to its operations and maintenance fund to pay for the projects when those bills became due.

¶ 8    In their motion for summary judgment, the School Districts argued that the 2007 working-cash-fund bond issuance was authorized under article 20 of the School Code and that the bonds were properly issued pursuant to that article. Specifically, they noted that the board's resolution explicitly stated that working cash bonds were to be issued and the notices of intent stated that the bonds were being issued under article 20 to increase the working cash fund. The School Districts also maintained that article 20 authorized the proceeds of the bonds to be transferred or abated from the working cash fund to the operations and maintenance fund. The School Districts further argued that section 19-3 and its direct-referendum requirement were inapplicable and irrelevant to bonds properly issued under article 20. Moreover, working-cash-fund bonds issued under article 20 were considered "limited bonds." The School Districts noted that the Property Tax Extension Limitation Law did not apply to limited bonds properly issued under article 20.

¶ 9    In their response to the motion for summary judgment, the taxpayers argued as follows. Section 19-3 provided the only statutory authority to issue bonds to "improve the sites of, build and equip additions to, and alter, repair, and equip" existing school buildings. Bonds issued under article 20 were limited in purpose, and no language in article 20 "enumerate[d]" a legislative intent to allow school districts to issue working-cash-fund bonds for the purposes of operations and maintenance. To construe the statutory provisions otherwise would create an absurdity in that no school district would ever opt for a direct referendum under section 19-3. Here, the School Districts ignored legislative intent by issuing working-cash-fund bonds for the purposes of equipping, altering, and repairing existing school buildings. The School Districts "scammed" the taxpayers by issuing false and misleading notices that did not specify that the working-cash-fund bond proceeds would be used for "operations and maintenance." The taxpayers argued that the bonds were void because they were issued without a direct referendum.

¶ 10    In their reply, the School Districts argued as follows. Article 20 authorized the issuance of working-cash-fund bonds to obtain proceeds that could be used for operations and maintenance purposes. Additionally, requiring a school district to set forth in the notice of intent its intended use of working-cash-fund bond proceeds would go beyond the notice requirements set forth in article 20 and would otherwise strip a school district of the discretion to use the bond proceeds for unforeseen "corporate purposes" that might arise. Furthermore,

section 19-3's direct-referendum requirement was inapplicable because (1) article 20 allowed for the abatement of working-cash-fund monies to any other fund in the school district and (2) article 20 contained its own provisions for a "backdoor" referendum.

¶ 11 The trial court granted the motion for summary judgment. In its written order, the court rejected the taxpayers' argument that section 19-3 was the sole source of financing for building, equipping, altering, and repairing schools. The court found that article 20 authorized the School Districts to abate or transfer the bond proceeds to the operations and maintenance fund to pay for repairs, alterations, and improvements. The court noted that the use of the bond proceeds for those purposes "sustain[ed]" the schools that educated students on a daily basis. The court thus found that the School Districts properly issued working-cash-fund bonds and that they appropriately followed the requirements of article 20 in issuing those bonds. Additionally, the court rejected the taxpayers' argument that the School Districts' notices were deficient or misleading, as article 20 required them only to publish notice of their intent to issue bonds in accordance with article 20. Furthermore, the court rejected the taxpayers' argument that section 19-3 would be rendered meaningless if the School Districts were allowed to use working-cash-fund bonds in this manner. The court noted that working-cash-fund bonds were limited in the amount that could be issued, whereas bonds associated with section 19-3 were subject to a higher general debt limitation, thus evidencing the legislature's intent that section 19-3 be used for "larger projects."

¶ 12 The court found "no just reason for delaying either enforcement or appeal or both" of its judgment, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016). This timely appeal followed.

¶ 13                                    II. ANALYSIS

¶ 14 The taxpayers contend that the trial court erred in granting the School Districts' motion for summary judgment. Summary judgment is appropriate when the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2016). "The interpretation and applicability of legislation present questions of law resolvable through summary judgment." *Allegis Realty Investors v. Novak*, 223 Ill. 2d 318, 330 (2006). We review *de novo* the trial court's grant of summary judgment. *Allegis Realty Investors*, 223 Ill. 2d at 330. We also review *de novo* issues of statutory construction. *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 29.

¶ 15 The taxpayers argue that article 20 did not grant the School Districts the authority to issue "building bonds." They contend that article 20 limited the purposes for which bond proceeds could be used and that article 20 "specifically excluded" routine operations and maintenance projects from those purposes. The taxpayers further submit that section 19-3 of the School Code was the sole statutory authority under which the School Districts could issue bonds and raise money to equip, alter, and repair existing school buildings.

¶ 16 Article 20 of the School Code (105 ILCS 5/20-1 *et seq.* (West 2002)) provides for the creation of working cash funds and governs the use of those funds. When the bonds here were issued, section 20-1 authorized a school district to create a working cash fund "for the purpose of enabling the district to have in its treasury at all time[s] sufficient money to meet demands thereon for ordinary and necessary expenditures for corporate purposes." 105 ILCS 5/20-1 (West 2002). A district was able to issue bonds for the purpose of creating a working cash fund

(105 ILCS 5/20-2 (West 2002)), and bonds could also be issued to obtain funds for an existing working cash fund. *In re Application of Walgenbach*, 104 Ill. 2d 121, 127 (1984). A school district could issue bonds under article 20 only after it adopted a resolution declaring its intent to issue bonds for the purpose provided in article 20 and after publishing in a newspaper of general circulation a notice of its intent to issue the bonds. 105 ILCS 5/20-7 (West 2002).

¶ 17    Additionally, section 20-4 of the School Code provided that money in the working cash fund "shall not be regarded as current assets available for school purposes." 105 ILCS 5/20-4 (West 2002). But that same section further provided that "[m]oneys in the fund shall not be used by the school board in any manner other than to provide moneys with which to meet ordinary and necessary disbursements for salaries and other school purposes and may be transferred in whole or in part to the general funds or both of the school district and disbursed therefrom in anticipation of the collection of taxes lawfully levied for any or all purposes." 105 ILCS 5/20-4 (West 2002). Money in the working cash fund was to be transferred to another district fund pursuant to a resolution passed by the school board. 105 ILCS 5/20-5 (West 2002). Furthermore, section 20-10, which was added to the School Code in 2010 (see Pub. Act 96-1277, § 5 (eff. July 26, 2010)), allowed a school district to abate and transfer, at any time, money in the working cash fund "to any fund or funds of the district most in need of the money." 105 ILCS 5/20-10 (West 2010). Section 20-10 also "validated" any such abatements and transfers that occurred before that provision took effect. 105 ILCS 5/20-10 (West 2010).

¶ 18    On the other hand, section 19-3 of the School Code provided, in pertinent part, that a school district:

"may borrow money for the purpose of building, equipping, altering or repairing school buildings or purchasing or improving school sites, or acquiring and equipping playgrounds, recreation grounds, athletic fields, and other buildings or land used or useful for school purposes *** but no such bonds shall be issued unless the proposition to issue them is submitted to the voters of the district at a referendum held at a regularly scheduled election." 105 ILCS 5/19-3 (West 2002).

Section 19-3 further provided that the proceeds of any bonds issued under that section "shall be deposited" into a school district's "Site and Construction/Capital Improvements Fund." 105 ILCS 5/19-3 (West 2002).

¶ 19    In construing a statute, our primary objective is to ascertain and give effect to the intent of the legislature. *Lutkauskas*, 2015 IL 117090, ¶ 36. The best evidence of that intent is the language of the statute itself, which must be given its plain, ordinary, and popularly understood meaning. *Lutkauskas*, 2015 IL 117090, ¶ 36. "[A] court may consider the reasons for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Lutkauskas*, 2015 IL 117090, ¶ 36. Courts presume that the legislature did not intend for a statute to lead to absurd, inconvenient, or unjust results. *Lutkauskas*, 2015 IL 117090, ¶ 36.

¶ 20    The crux of the taxpayers' argument is that a school district could not issue article 20 working-cash-fund bonds if the school district intended to use the bond proceeds to improve, build, equip, alter, or repair existing school buildings. Section 20-1, however, provided that a school district could maintain and administer a working cash fund to have sufficient money in its treasury for "corporate purposes." 105 ILCS 5/20-1 (West 2002). Further, section 20-4 provided that money in the working cash fund was not regarded as "current assets available for school purposes," but could otherwise be transferred to the school district's general funds to

meet "ordinary and necessary disbursements for salaries and other school purposes." 105 ILCS 5/20-4 (West 2002). Section 20-10 allowed a school district to abate its working cash fund at any time and transfer money to the district's funds that were most in need of the money; that section "validated" any such abatements that occurred before 2010. 105 ILCS 5/20-10 (West 2010). Thus, the plain language of article 20 evidences the legislature's intent that working-cash-fund bond proceeds could be transferred or abated to a school district's relevant funds for "corporate purposes" or to meet the ordinary and necessary disbursements for salaries and other "school purposes."

¶ 21    The legislature did not define "corporate purposes" in article 20 of the School Code. Black's Law Dictionary defines "corporate purpose" as "the general scope of the business objective for which a corporation was created." Black's Law Dictionary 365 (8th ed. 2004). Similarly, our supreme court has defined the term as "some purpose which is germane to the object for which the corporation was created, or such as has a legitimate connection with that object and a manifest relation thereto." *People ex rel. Illinois Armory Board v. Kelly*, 369 Ill. 280, 286 (1938). The supreme court has further noted that a tax for a "corporate purpose" is defined as a tax "to be expended in a manner which shall promote the general prosperity and welfare of the community which levies it." *Illinois Armory Board*, 369 Ill. at 286 (citing *Taylor v. Thompson*, 42 Ill. 8, 9 (1866)). Moreover, the term "corporate purpose" should not receive a narrow or rigid construction. *Illinois Armory Board*, 369 Ill. at 288.

¶ 22    A school district's board of education was considered a "body politic and corporate" (105 ILCS 5/10-2 (West 2002)) and had the powers specifically enumerated in article 10 of the School Code (105 ILCS 5/10-20 (West 2002)). A board was empowered to exercise "all other powers" not inconsistent with the School Code that "may be requisite or proper for the maintenance, operation, and development of any school or schools" under its jurisdiction. 105 ILCS 5/10-20 (West 2002). In that vein, a board had the power to visit, inspect, and "maintain" the public schools under its jurisdiction. 105 ILCS 5/10-20.6 (West 2002). It was also empowered to "repair and improve schoolhouses and furnish them with the necessary fixtures, furniture, apparatus, libraries, and fuel." 105 ILCS 5/10-22.7 (West 2002). Additionally, a board had the power to borrow money and issue bonds for the purposes and in the manner set forth in the School Code. 105 ILCS 5/10-22.14 (West 2002).

¶ 23    Through the above statutes, the School Code created boards of education to maintain, operate, and develop schools within their districts' jurisdiction. To that end, the legislature specifically empowered boards to improve, furnish, equip, alter, and repair schools. It thus follows that improving, maintaining, equipping, altering, and repairing school buildings was germane to the objective for which a board was created, thereby constituting a "corporate purpose." Furthermore, a board was explicitly authorized to issue bonds for the purposes set forth in the School Code. Article 20 authorized the issuance of working-cash-fund bonds for the purpose of allowing a school district to have sufficient money in its treasury for "corporate purposes." Because improving, maintaining, equipping, altering, and repairing school buildings was a "corporate purpose" germane to the objective of a board, a school district could issue bonds under article 20 for those purposes.

¶ 24    While the taxpayers repeatedly contend that money in the working cash fund was not to be regarded as "current assets available for school purposes," they conveniently ignore that same statute's provision that money in the fund could be transferred to the district's general funds to provide money with which to meet ordinary and necessary disbursements for "other school

purposes." See 105 ILCS 5/20-4 (West 2002). The taxpayers also ignore section 20-10, which provided that a school district was allowed to abate money from the working cash fund to any district fund that needed money. See 105 ILCS 5/20-10 (West 2010). Additionally, at oral argument, the taxpayers' counsel contended that money in the working cash fund was to be held as "reserves." But section 20-1 provided that a working cash fund enabled a district to have sufficient money in its treasury to meet demands for "ordinary and necessary expenditures for corporate purposes." 105 ILCS 5/20-1 (West 2002). Further, our supreme court had explained that "the working cash fund constitutes a revolving fund" that enabled a "municipality to do business on a cash basis by transferring money from the working cash fund to other funds." *Mathews v. City of Chicago*, 342 Ill. 120, 125 (1930). Accordingly, we hold that article 20 authorized the School Districts to issue working-cash-fund bonds for the "corporate purposes" of improving, maintaining, equipping, altering, and repairing existing school buildings.

¶ 25    The taxpayers contend that construing article 20 to allow school districts to issue working-cash-fund bonds with the intention to use the proceeds for operations and maintenance purposes would ignore legislative intent and create an "absurdity." As part of this argument, the taxpayers rely heavily on the canon of statutory interpretation that provides: "absent any strong indication of a contrary legislative intent, the legislature's decision to enumerate one thing in a statute implies the exclusion of all other similar nonenumerated things." *Commonwealth Edison Co. v. Illinois Property Tax Appeal Board*, 378 Ill. App. 3d 901, 916 (2008). The taxpayers appear to rely on this maxim to argue that the legislature "specifically enumerated" the purposes for which working-cash-fund money could be used. They contend that nothing in article 20 enumerated the legislature's intent to permit working-cash-fund bond proceeds to be used for "operations and maintenance ('building funds') purposes."

¶ 26    The taxpayers' argument misses the mark. As explained, improving, maintaining, equipping, altering, and repairing school buildings was a "corporate purpose." Because working cash funds could be created and maintained to allow a school district to have sufficient money for "corporate purposes," money from the working cash fund, including bond proceeds, could be transferred or abated to the appropriate fund under article 20 and used to pay for alterations, equipment, and repairs. To exclude "routine" operations and maintenance expenses from the purview of article 20 would be inconsistent with the definition of "corporate purposes" as well as the statutory powers explicitly granted to boards of education. Moreover, our supreme court had explained that the intent of the working cash fund was "to provide funds which may be available for transfer to the operating funds of the district, such as its educational, *operations, building or maintenance funds*, and repaid to the working cash fund upon collection of the anticipated taxes." (Emphasis added.) *Walgenbach*, 104 Ill. 2d at 126; see also *Mathews*, 342 Ill. at 125 ("Thus the working cash fund constitutes a revolving fund from which money may be transferred to other funds in anticipation of taxes to be collected for the purposes of such other funds *** and a method is provided enabling the municipality to do business on a cash basis by transferring money from the working cash fund to other funds during the time between the levy of taxes for such other funds and the collection of the taxes so levied.").

¶ 27    The taxpayers further contend that section 19-3 enumerated the "specific grant of authority and rights of the districts to raise funds and issue bonds for building purposes," thereby

implying that no other statutory provisions authorized the School Districts to raise funds or issue bonds for those purposes. They also invoke, by way of a parenthetical citation, the notion that when two conflicting statutes cover the same subject, the specific statute governs over the general. See *People ex rel. Madigan v. Burge*, 2014 IL 115635, ¶ 31.

¶ 28   We begin by rejecting the taxpayers' insinuation that section 19-3 is the sole statutory provision under which a school district may "raise funds and issue bonds" for improvement, maintenance, equipment, alteration, and repair purposes. Such a statement flies in the face of other provisions in the School Code that permitted a school district to raise funds for such purposes. For example, section 17-2.3 allowed a school district to impose a direct tax levy to accumulate funds for capital improvement purposes. 105 ILCS 5/17-2.3 (West 2002). Capital improvements "include but are not limited to the construction of a new school building or buildings or the purchase of school grounds on which any new school building is to be constructed or located, or both." 105 ILCS 5/17-2.3 (West 2002). Additionally, a school district could issue tax anticipation warrants to provide a fund to meet the expenses of "all operations and maintenance purposes." 105 ILCS 5/17-6 (West 2002). Section 17-6.1 also allowed a school district to seek to increase the maximum authorized tax rate for "operations, building and maintenance purposes." 105 ILCS 5/17-6.1 (West 2002). As a final example, section 17-2.11 authorized a school district to levy a tax or issue bonds for the purpose of altering, repairing, or reconstructing existing school buildings for fire prevention, safety, energy conservation, accessibility, school security, and other specified repair purposes. See 105 ILCS 5/17-2.11 (West 2002).

¶ 29   We also reject the taxpayers' argument that section 19-3 was the exclusive and "specific" provision under which a school district could issue bonds for the purpose of improving, maintaining, equipping, altering, or repairing existing school buildings. To construe the statutory provisions otherwise would require this court to read exceptions into article 20 that the legislature did not intend. See *Solon v. Midwest Medical Records Ass'n, Inc.*, 236 Ill. 2d 433, 441 (2010) ("We do not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that conflict with the expressed intent."). Neither section 20-4 nor section 20-10 proscribed or limited the different funds into which working-cash-fund money could be transferred or abated. See 105 ILCS 5/20-4 (West 2002) (money in the working cash fund may be transferred to the school district's "general funds" to meet the ordinary and necessary disbursements for "salaries and other school purposes"); 105 ILCS 5/20-10 (West 2010) (a school district may abate its working cash fund at any time and transfer money "to any fund or funds of the district most in need of the money"). Furthermore, section 17-7 of the School Code explained that "[a]ny sum expended or obligations incurred for the improvement, maintenance, repair or benefit of school buildings and property, including the cost of interior decorating and the installation, improvement, repair, replacement and maintenance of building fixtures *** shall be paid from the tax levied for operations and maintenance purposes and the purchase of school grounds." 105 ILCS 5/17-7 (West 2002). Accordingly, if section 19-3 were the sole statutory source under which a school district could issue bonds for building purposes, then school districts would be prevented from transferring or abating working-cash-fund bond proceeds to the operations and maintenance fund, which was the fund used to pay for repairs and improvements to existing school buildings. The legislature did not intend such a result, as the plain language in article 20 permitted a school district to transfer or abate working-cash-fund money to any of the district's general funds. See

also *Walgenbach*, 104 Ill. 2d at 126 (the intent of the working cash fund was to provide "funds which may be available for transfer to the operating funds of the district, such as its educational, operations, building or maintenance funds"). Thus, it is reasonable to conclude that the legislature intended article 20 and section 19-3 to be valid alternatives for school districts to issue bonds to improve, maintain, equip, alter, and repair existing school buildings.

¶ 30   Moreover, to interpret the relevant statutory provisions as the taxpayers suggest would lead to absurd, inconvenient, and unjust consequences. See *Solon*, 236 Ill. 2d at 441 ("We may also consider the consequences that would result from construing the statute one way or the other. [Citation.] In doing so, we presume that the legislature did not intend absurd, inconvenient, or unjust consequences."). Section 19-3 required a direct referendum before a school district could issue bonds under that section. 105 ILCS 5/19-3 (West 2002). If school districts were limited to issuing bonds under section 19-3, they would be required to initiate and manage a referendum every time they sought to issue bonds for equipping, altering, and repairing existing school buildings. Here, District 10 issued working-cash-fund bonds and used the proceeds to pay for, among other relatively minor projects, door replacements, roof maintenance, carpet replacement, ceiling repair, and toilet replacements. The record shows that each project cost less than $100,000, oftentimes significantly less (some projects cost only about $3000). We decline to hold that the legislature intended school districts to submit each bond issuance for minor repair work to a direct referendum. The expenses associated with the referendum could potentially surpass the expenses needed to complete the minor repair work itself.

¶ 31   Nevertheless, relying on *Moyer v. Board of Education of School District No. 186*, 391 Ill. 156 (1945), the taxpayers contend that our supreme court established section 19-3 as the specific statutory source under which a school district could issue bonds for building purposes. The taxpayers interpret *Moyer* far too broadly. The supreme court in *Moyer* simply held that a school district's power to issue bonds for the purpose of improving school sites included the ability to issue bonds for the purpose of constructing and improving athletic fields or stadiums. *Moyer*, 391 Ill. at 163-64. *Moyer* did not stand for the broad proposition that section 19-3 was the exclusive source under which a school district could issue bonds for the purposes of improving, maintaining, equipping, altering, or repairing existing school buildings.

¶ 32   The taxpayers also question why any school district would choose to issue bonds under section 19-3, which required a direct referendum, rather than article 20, if both provisions allowed a school district to use the bond proceeds for similar purposes. As the trial court noted, bonds issued under section 19-3 are subject to a higher general debt limitation than the capped amount of bonds issued under article 20. See 105 ILCS 5/19-1, 19-3, 20-2 (West 2002). Section 19-3 further provided that proceeds from bonds issued under that section "shall be deposited and accounted for separately within the Site and Construction/Capital Improvements Fund." 105 ILCS 5/19-3 (West 2002). In section 17-2.3, the legislature explained that "capital improvements include but are not limited to the construction of a new school building or buildings or the purchase of school grounds on which any new school building is to be constructed or located, or both." 105 ILCS 5/17-2.3 (West 2002). Construing the statutory

- 10 -

provisions together, the legislature intended that section 19-3 could be used for larger projects than could article 20, such as the construction of a new school building.[2]

¶ 33 Furthermore, relying on *People ex rel. Harding v. Chicago & North Western Ry. Co.*, 413 Ill. 93 (1952), and *People ex rel. Meyers v. Chicago & North Western Ry. Co.*, 1 Ill. 2d 255 (1953), the taxpayers argue that the School Districts engaged in "subterfuge" when they issued bonds under article 20. In *Harding*, the school district passed a resolution to transfer money from the building fund to the educational fund, explicitly stating that the money was not needed in the building fund. *Harding*, 413 Ill. at 97. Two months later, the school district levied a tax to raise money for the building fund. *Harding*, 413 Ill. at 97. Our supreme court held that the levy for the building fund was invalid, noting that the school district's conduct was a "clever subterfuge" to augment the educational fund by way of an "excessive and unnecessary" levy for the separate and distinct building fund. *Harding*, 413 Ill. at 99.

¶ 34 Similarly, in *Meyers*, school districts passed resolutions to transfer money from the building fund to the educational fund, stating that the money was not needed for building purposes. *Meyers*, 1 Ill. 2d at 261. At about the same time, the school districts adopted levy resolutions stating that a levy for building purposes was needed. *Meyers*, 1 Ill. 2d at 263. The supreme court held that the levy was invalid, noting that the two resolutions could not both be true; the school districts were thus augmenting the educational fund by diverting money from the building fund. *Meyers*, 1 Ill. 2d at 263.

¶ 35 *Harding* and *Meyers* are inapposite. Here, the School Districts adopted resolutions declaring their intent to issue bonds under article 20 for the working cash fund. The subsequent bond resolutions stated that it was the "reasonable expectation" and "present intention" of the School Districts to use the bond proceeds, in accordance with article 20, for improvements, maintenance, equipment, alterations, and repairs of existing school buildings. As explained, the School Districts were allowed to transfer or abate working-cash-fund money to any general fund for "corporate purposes." Improvements, maintenance, equipment, alterations, and repairs of existing school buildings were "corporate purposes" under article 20. Hence, unlike in *Harding* and *Meyers*, the School Districts did not issue conflicting resolutions or improperly augment one fund at the expense of another.[3]

¶ 36 We further reject the taxpayers' argument that the School Districts "scammed" the public by issuing "fraudulent" notices that "hid" their true intent as to the purpose of the bond issuances. As explained, the School Districts were allowed to issue bonds under article 20 with the intent to use the proceeds for alteration, equipment, and repair purposes. Before issuing the bonds, however, the School Districts were required to adopt resolutions declaring their intent to issue bonds for the purpose provided in article 20. 105 ILCS 5/20-7 (West 2002). They were

---

[2]At oral argument, the taxpayers' counsel contended that there is no legislative history to support this conclusion. The statutory language, however, is plain and unambiguous, so we need not consider legislative history. See *Kunkel v. Walton*, 179 Ill. 2d 519, 536 (1997) ("[B]ecause the language of the statute is plain and unambiguous, we have no occasion to consider its legislative history."). Here, section 19-1 explicitly subjected bonds issued under article 19 to a higher general debt limitation, and section 19-3 provided that bond proceeds were to be distributed to the "Site and Construction/Capital Improvements Fund."

[3]The taxpayers do not allege that the School Districts failed to properly follow the transfer or abatement provisions of article 20, nor do they allege that the bond issuances or the amounts of money that were transferred or abated were unnecessary.

- 11 -

also required to publish in a newspaper of general circulation a notice setting forth (1) their intent to issue "bonds in accordance with this Article," (2) the time within which a petition could be filed requesting a referendum on the bond issuance, (3) the specific number of voters required to sign the petition, and (4) the date of the prospective referendum. 105 ILCS 5/20-7 (West 2002). The Bond Issue Notification Act (30 ILCS 352/1 (West 2002)) further provided that a notice needed to detail the time and location of a public hearing, the amount of the bond issuance, and the purpose of the bond issuance. 30 ILCS 352/15 (West 2002).

¶ 37    Here, the School Districts complied with section 20-7 of the School Code and section 15 of the Bond Issue Notification Act. In the case of District 10, it adopted a resolution explaining its intent to issue bonds in accordance with article 20. It then published in a newspaper of general circulation a notice detailing the time and place of the public hearing as well as the amount of the bonds sought to be issued. In the notice, District 10 also explained its intent to issue bonds under article 20 for the "purpose of increasing" its working cash fund, thereby enabling District 10 to have "at all time[s] sufficient money to meet demands thereon for ordinary and necessary expenditures for corporate purposes." The notice further stated that the voters had 30 days to submit a petition signed by 524 voters of the district, requesting that a referendum be held on April 17, 2007. By issuing notices that complied with section 20-7, the School Districts explicitly informed the public that the bond proceeds would be used for "corporate purposes." The phrase "corporate purposes" in this section had a broad scope, and together with the related statutes, it enabled the District to transfer working cash funds for "corporate purposes" to fund a myriad of uses, which included improving, maintaining, equipping, altering, and repairing existing school buildings. Thus, the School Districts did not "scam" the public or otherwise "hide" the purpose of the bond issuances. Indeed, if the taxpayers had questions or reservations about the bond issuances in any respect, including the scope of "corporate purposes," they had the opportunity to attend the public hearings that were held and pose their questions or otherwise submit petitions requesting that the issuances be subject to a referendum; they filed no such petitions.[4]

¶ 38    Contrary to the taxpayers' assertions, the School Districts were not required to outline with greater specificity how they intended to use their article 20 bond proceeds. To hold otherwise would require this court to impose a new condition into section 20-7 that the legislature did not enact. Also, such a requirement would undermine the purpose of the working cash fund. School districts would be stripped of their discretion to use article 20 bond proceeds for unforeseen "corporate purposes." Instead, they would be restricted to using the proceeds for the specific purposes outlined in the notice, regardless of the different exigencies that a school district might encounter. The School Code imposed no requirement that the School Districts delineate more specifically in their notices of intent the intended uses of the article 20 bond proceeds.

¶ 39    The taxpayers further argue in passing that the School Districts violated the Property Tax Extension Limitation Law (35 ILCS 200/18-185 *et seq.* (West 2002)). They do not develop their argument or cite any authority to support it. Illinois Supreme Court Rule 341(h)(7) (eff. Jan. 1, 2016) provides that an appellant's brief must contain "the contentions of the appellant

---

[4]We further note that there are no transcripts in the record from the public hearings in which the School Districts adopted the resolutions declaring their intent to issue article 20 bonds. Nor are there transcripts in the record from the public hearings held on the notices of intent.

and the reasons therefor, with citation of the authorities and the pages of the record relied on." Contentions without argument or citation of authority and contentions supported by some argument but by no authority do not meet the requirements of Rule 341(h)(7). *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 720 (2010). The taxpayers' argument is thus forfeited. See *Vilardo*, 406 Ill. App. 3d at 720. We nevertheless briefly note that the taxpayers do not meaningfully contest the School Districts' argument that article 20 bonds were "limited bonds" within each School District's debt service extension base (see 30 ILCS 350/15.01 (West 2002)), thereby excluding those bonds from each School District's "aggregate extension" (see 35 ILCS 200/18-185 (West 2002)) and exempting them from the referendum requirements set forth in section 18-190 of the Property Tax Extension Limitation Law (35 ILCS 200/18-190 (West 2002)).

¶ 40    Finally, the taxpayers contend that a genuine issue of material fact exists. We disagree. None of the material facts are in dispute. The School Districts do not dispute that they issued the article 20 bonds with the "present intention" and "reasonable expectation" to use the bond proceeds for the purpose of improving, maintaining, equipping, altering, and repairing existing school buildings. Instead, the issue on appeal is limited to the purely legal matter of interpreting the School Code to determine whether the School Districts were authorized to issue the bonds under article 20 or whether they were instead required to issue them under section 19-3, which required a direct referendum. Issues involving statutory interpretation are resolvable through summary judgment. *Allegis Realty Investors*, 223 Ill. 2d at 330. We resolve the issue in favor of the School Districts. Thus, we hold that the trial court did not err in granting their motion for summary judgment.

¶ 41                                    III. CONCLUSION
¶ 42    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 43    Affirmed.